Larry J. OSBOURNE, et al., Appellants,

v.

**CAPITAL CITY MORTGAGE CORPORATION,**
Appellee.

No. 93–CV–1653.

District of Columbia Court of Appeals.

Argued Sept. 15, 1995.
Decided Nov. 13, 1995.

Paris A. Artis, Washington, DC, for appellants.

Eric J. Sanne, Chevy Chase, MD, for appellee.

Before TERRY, FARRELL and RUIZ, Associate Judges.

FARRELL, Associate Judge:

This appeal is from an order granting summary judgment to appellee Capital City Mortgage Corporation in a suit by appellants Larry and Sandra Osbourne for breach of contract and other claims relating to a loan transaction between the parties. The Osbournes contend that, contrary to the conclusions of the trial judge: (1) the record presents triable issues of fact on their claims of breach of contract and unfair and deceptive trade practices; (2) the deed of trust did not permit Capital City to advance superior trust payments to a previous note holder and charge interest on them; and (3) the Osbournes had standing to maintain an action for breach of the obligation to release the deed of trust and for misrepresentation of the payoff amount. We reverse and remand the order granting summary judgment on the breach of contract claim to the extent

that it alleges accounting errors and overcharging by Capital City, as well as on the claims for breach of the obligation to release trust, misrepresentation, and unfair and deceptive trade practices under D.C.Code §§ 28–3312 & –3904 (1991). We affirm the trial court's legal ruling that the contract permitted Capital City to forward payments to the first note holder, to add those amounts to the debt and to charge interest at the contract rate on the additional principal.

## I.

On November 6, 1986, the Osbournes executed a note in favor of Capital City for the principal loan amount of $10,000, with interest accruing at 24% per annum and monthly payments of $220.48. The note was secured by a deed of trust which conveyed the Osbournes' property at 2618 10th Street, N.W., to trustees for the benefit of Capital City and its successors. The same property was security for a prior loan on which the Osbournes owed $506 per month (the record does not reveal the principal amount). In order to safeguard Capital City's rights in the property, the Osbournes agreed in the note to make monthly payments on the superior loan directly to Capital City, which in turn would forward the payments to the superior note holder. Capital City interpreted the note and deed of trust as permitting it to advance payments to the superior trust in the event the Osbournes missed a payment, and to add any such payments to the principal balance and charge interest thereon.

On March 27, 1989, Capital City issued a Notice of Foreclosure Sale based on the Osbournes' failure to make $13,014.55 in payments, including interest and accrued charges. The Osbournes negotiated with First Government Mortgage & Investors Corporation to refinance the Capital City loan as well as some additional debt. First Government was to succeed to Capital City's second trust position. First Government hired Mid–Atlantic Title, Inc., to conduct the title search and loan settlement. Michael Perry, president of Mid–Atlantic, was in charge of the settlement scheduled for May 23, 1989.

Prior to settlement, First Government requested a statement from Capital City as to the total amount required to pay off the Osbourne note. In a letter dated May 10, 1989, Capital City stated that the "approximate" payoff amount through June 1, 1989, was $24,346.51. The letter disclaimed the accuracy of the amount, which was "subject to final audit," and advised First Government to contact the auctioneer, Goldsten Realty, "for the amount of auctioneer's fees and attorney's fees that must be paid in addition to the payoff amount." First Government forwarded the payoff letter to Perry, who (in deposition) could not say whether anyone in his office called Goldsten to determine the amount of auctioneer's fees.

On May 31, 1989, Mid–Atlantic hand-delivered to Capital City a check for $24,346.51, which did not include auctioneer's fees, and a Certificate of Satisfaction/Deed of Release. On that same day, Goldsten Realty issued an invoice to Capital City for auctioneer's fees of $2285.60 from the foreclosure sale that had been cancelled. Capital City paid Goldsten Realty on June 2, 1989, and posted the amount on the Osbournes' account, precluding release of the deed of trust. The Osbournes made no further payments to Capital City after May 1989.

At a time prior to July 7, 1989, Perry became aware that Capital City would not release the deed of trust because of an outstanding advertising fee. He wrote to Capital City requesting "an explanation for the $2500 advertising fee." The record does not disclose Capital City's response, or whether Perry took any additional steps to resolve the situation. Capital City meanwhile continued to charge interest on the unpaid balance (the record does not reveal what that balance was or how it squared with the $24,346.51 payment) and to send the Osbournes monthly statements reflecting overdue payments. Presumably Capital City also continued making payments to the first note holder, adding those additional amounts to the principal and charging interest at the contract rate. According to Mr. Osbourne, when he inquired about the overdue payment notices, Capital City told him the statements were mistakes and "to disregard them."

In or around August 1990, Capital City initiated a second foreclosure action against the Osbourne property. On September 11, 1990, prior to the commencement of a foreclosure sale, Perry communicated to Capital City Mid–Atlantic's desire to purchase the Osbourne note and requested a payoff statement. Mid–Atlantic subsequently purchased the note for $12,108.28. When the Osbournes failed to pay Mid–Atlantic on the note, they were notified by Mid–Atlantic that they were in default and that failure to cure the default would result in foreclosure. Rather than cure the default, the Osbournes countered with a four-count complaint against Capital City alleging breach of contract, breach of the obligation to release the trust, misrepresentation of the payoff amount, and unfair and deceptive trade practices. While Mid–Atlantic had threatened to foreclose, it subsequently agreed to postpone its foreclosure action until this suit revealed "who owed what." Capital City answered the Osbournes' complaint and moved to dismiss the complaint for failure to state a cause of action. The trial judge agreed to treat the motion as one for summary judgment and invited Capital City to supplement the motion. Eventually the judge granted summary judgment to Capital City on all counts. The Osbournes filed a motion for reconsideration, which was denied by the court on November 16, 1993. This appeal followed.[1]

## II.

In reviewing a grant of summary judgment, we apply the same standard as does the trial court in considering the motion. *Byrd v. Allstate Ins. Co.,* 622 A.2d 691, 693 (D.C.1993). Summary judgment is appropriate where the facts submitted to the trial court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Super.Ct.Civ.R. 56(c); *Hol-*

*land v. Hannan,* 456 A.2d 807, 814 (D.C. 1983). In considering the motion as it related to the breach of contract claim, the trial judge viewed that count as setting forth two groups of claims, one containing factual issues and the other only a legal issue. First, the Osbournes alleged accounting errors and the imposition of excess charges on their account. Second, they challenged Capital City's authority under the deed of trust to advance superior trust payments and charge interest on the advanced sums as principal. Considering the first group of claims, the trial judge found no factual support for a triable issue on the allegations of accounting errors and excess charges. Concerning the second claim, the judge concluded, as a matter of law, that the deed of trust and promissory note gave Capital City authority to make advances and charge interest on them. We will address the judge's conclusions in turn.

### A.

Capital City, as the moving party, has the burden of showing that no material fact is in dispute. *Clay Properties, Inc. v. Washington Post Co.,* 604 A.2d 890, 893 (D.C. 1992) (en banc); *Holland,* 456 A.2d at 815. Only after the requisite showing has been made by Capital City does the burden shift to the Osbournes to show " 'sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " *Clay Properties,* 604 A.2d at 894 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)); *Landow v. Georgetown–Inland W. Corp.,* 454 A.2d 310, 313 (D.C.1982). To the extent described below, Capital City failed to meet its initial burden.

In count one of the complaint, the Osbournes alleged, without specification, that

---

[1] Capital City's brief contains a lengthy jurisdictional challenge to the sufficiency of the notice of appeal. Capital City contends that since the notice of appeal only listed the order denying the motion for reconsideration as the order on review, the ruling on summary judgment is not properly before the court. This exact issue has previously been resolved by this court. *See Wal-*

*lace v. Warehouse Employees Union No. 730,* 482 A.2d 801, 810 n. 26 (D.C.1984) (court may review both a ruling on summary judgment and the denial of reconsideration, even though appellants' notice of appeal listed only a challenge to the order denying the motion for reconsideration).

Capital City had breached its contract with them and acted in bad faith by failing to account properly for various payments and charges and by overcharging them in general. Capital City responded by submitting, as part of its summary judgment motion, a reconstructed and admittedly unauthenticated accounting "which accurately reflects the entries made on defendants' Exhibit 3[,] an authenticated copy of plaintiffs' loan ledger with Capital City." The reconstruction was supported by an affidavit of David Richardson, Capital City's account administrator, in which he averred that the reconstruction "truly and accurately reflects all entries on Exhibit 3," excepting some erroneous entries that were immediately voided. The Osbournes were unable to present any documentation, aside from some overdue payment notices reflecting amounts owed on the note at various times, to support their claims. While they stated at oral argument that the reconstruction was inaccurate and not competent evidence, the only challenge to this document in the record is in response to Capital City's interrogatories. In that response, the Osbournes challenged generally the reconstruction, stating that they did not understand the reconstructed accounting and that all payments were made.

Despite this weakness in the Osbournes' showing, Capital City through its own submissions created a factual issue of whether it had properly accounted for and assessed charges on the Osbourne loan. Contrary to the Richardson affidavit, the reconstruction appears to bear little relation to the authentic loan ledger. A date-by-date comparison reflects significant discrepancies in the numbers.[2] Additional discrepancies are revealed by comparing the payoff letter with both the reconstruction and the loan ledger. Neither the reconstruction nor the loan ledger reflects the numbers recited in the several overdue payment notices. These discrepancies raise questions of material fact as to whether Capital City accurately accounted for and assessed charges to the Osbournes.

In addition to the reconstruction and loan ledger, three documents purporting to reflect the total amount due on the Osbourne loan at different times highlight potential accounting errors by Capital City. In response to a letter from the Osbournes requesting information on the total amount due under the note, Capital City "approximated" the amount to be $29,680.13 as of February 13, 1989. Approximately six weeks later, on March 27, 1989, Capital City sent the Osbournes a foreclosure notice in which the total amount due had dropped to $24,790.84. The total amount decreased again slightly to $24,346.51 in the May 10, 1989 payoff letter (approximating payments through June 1, 1989).

The trial judge apparently overlooked this discordance in Capital City's exhibits and took the accounting and Richardson affidavit at face value. His decision was further influenced by the fact that "[t]he Osbournes ha[d] produced no evidence to contradict Richardson's accounting." But Superior Court Rule of Civil Procedure 56(e) provides that "[w]hen a motion for summary judgment is made *and supported* ..., an adverse party ... must set forth specific facts showing that there is a genuine issue for trial" (emphasis added). Given the abundant discrepancies in Capital City's own exhibits, it did not meet ("support") its initial burden of proving that no material fact was in dispute. Thus, the Osbournes' failure to submit evidence contradicting the already self-contradictory accounting is beside the point. "[I]f the moving party does not meet its initial burden, summary judgment must be denied even

2. By way of illustration, as of July 31, 1976, both the loan ledger and the reconstruction reflect a principal balance of $9893.96. By September 16, 1987, the principal balance reads $9903.91 on the loan ledger and 9792.67 on the reconstruction. By January 25, 1988, the principal balance increases to $10,151.29 on the loan ledger but decreases to $9689.15 on the reconstruction. The principal amount reflected on the loan ledger continues to climb, reaching $12,171.39 at the time of the initial payoff; according to the reconstruction, however, it decreases slightly to $9671.69 and remains constant until payoff. The rising principal balance on the loan ledger appears to be due in part to several additions to the principal marked "interest on escrows." The reconstruction reflects no such entries or additions. As of June 7, 1989, the date on which the payoff check was credited to the Osbourne account, the loan ledger shows a remaining principal balance of $2251.13, while the reconstruction reflects $2385.73 in outstanding debt.

where the opponent comes forth with nothing." *Burt v. First Am. Bank,* 490 A.2d 182, 185 (D.C.1985). We must therefore reverse the order granting summary judgment on count one to the extent it alleges accounting errors and miscellaneous excess charges by Capital City.

### B.

■ As to the legal issue presented by count one, we agree with the trial judge that, to the extent the count challenged Capital City's authority to advance superior trust payments, add them to the principal balance, and charge interest on them,[3] summary judgment was proper. Paragraph 7 of the deed of trust provides that if the borrower fails to perform any covenant "contained in this Security Instrument, ... [the] Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property," including "paying any sums secured by a lien which has priority over this Security Instrument." As the trial judge correctly noted, the only question is whether the superior trust advances "were paid because the Osbournes failed to perform a promise under the security agreement."

In answering affirmatively, the judge looked to interrelated provisions of the deed of trust and the note. Paragraph 4 of the deed required the borrower "promptly [to] discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender...." In this case, that written agreement existed in the note, where the Osbournes agreed to make first trust payments to Capital City, which in turn would forward them to the superior trust note holders.

This analysis presupposes that the two instruments incorporate one another, thus letting paragraphs 4 and 7 of the deed of trust be read in light of the note. The Osbournes contend, to the contrary, that the instruments are mutually exclusive and that, without incorporation, the language of paragraph 7 does not authorize superior trust advances since the Osbournes' failure to make superior trust payments to Capital City was not a failure to perform a covenant *contained in the security agreement.* We have held, however, that "the note and the trust deed can be considered merely different parts of a single contract," *Yasuna v. Miller,* 399 A.2d 68, 72 (D.C.1979).

> Deeds of Trust are viewed as generally equivalent to common law mortgages, a mortgage being by definition an interest in property given as security for the payment of a debt. Under the law of mortgages, a notion of fundamental importance is "that the security is inseparable from the obligation" for the mortgage's "sole function is to serve as security for the performance of the obligation."

*Id.* at 71–72 (internal footnote and citations omitted).

Moreover, the instruments themselves support incorporation into paragraph 7 of the note's agreement to make superior trust payments directly to Capital City. The deed of trust "secures to Lender ... (c) the performance of Borrower's covenants and agreements under this Security Instrument *and the Note*" (emphasis added). The note itself provides that a "Deed of Trust ... protects the Note Holder from possible losses which might result if I [the borrower] do not keep the promises which I make in this Note." Paragraph 4 of the deed of trust further requires the borrower either to pay off all superior liens or to make payments in a manner specified in a written agreement, which in this case the note contains. The note agreement, therefore, substitutes for the obligation to discharge promptly all superior liens. If the Osbournes breached the agreement in the note, the obligation to discharge all superior liens would resurface, permitting Capital City to protect its interests by advancing payments.

We therefore affirm that part of the order granting summary judgment on the legal

---

3. If Capital City had authority to advance payments, there is no question that it could also charge interest. Paragraph 7 of the deed of trust expressly adds any such advances to the borrow-er's debt and provides that "these amounts shall bear interest from the date of disbursement at the Note rate."

question of Capital City's authority to advance superior trust payments.

## III.

The trial court granted summary judgment on counts two (breach of obligation to release trust) and three (misrepresentation) after concluding that the Osbournes had not offered proof of injury and therefore lacked standing to sue Capital City on these claims. At the heart of both counts is the allegation that Capital City misrepresented the payoff amount and accordingly should be "estopped" from refusing to accept the original payoff ($24,346.51) as a complete satisfaction of the debt. The Osbournes claim as injuries that they have "incurred expenses," endured a clouded title on their property due to the recorded lien,[4] been subjected to foreclosure actions by both Capital City and Mid–Atlantic,[5] and "experience[d] severe psychological and emotional distress."

Capital City argued, and the trial court agreed, that (1) estoppel cannot support an affirmative claim in this case but could only be used prospectively as a defense by the Osbournes against a claim by Capital City (or its successor, Mid–Atlantic); and (2) because the Osbournes themselves paid nothing to Capital City after May 1989, they have suffered no injury at the hands of Capital City. *See Burleson v. United Title & Escrow Co.*, 484 A.2d 535, 537 (D.C.1983) ("Basic to standing is the requirement that the individual be injured in fact by the conduct of the other party."). Moreover, the judge concluded, the Osbournes are not in danger of future injury by Capital City, *Lee v. District of Columbia Bd. of Appeals & Review*, 423 A.2d 210, 217 (D.C.1980) (injury must be one plaintiffs "have suffered or are in immediate danger of sustaining"), because Capital City sold the note to Mid–Atlantic and released to

Mid–Atlantic its rights under the deed of trust. Consequently, any subsequent disputes regarding the note and trust are between the Osbournes and Mid–Atlantic, not Capital City.

The trial court's conclusion that the Osbournes had alleged no harm overlooked the injuries they claimed to have suffered from Capital City's attempted foreclosure in 1990. With respect to those claims of injury, therefore, we hold that summary judgment was improper. On the other hand, the trial judge correctly concluded that the Osbournes had offered no proof of injury with respect to the continued lien on their property or the possibility of foreclosure by Mid–Atlantic.

## A.

■ The Osbournes stated in their opposition to the motion for summary judgment that "[t]he natural and probable consequence of [actual or threatened] foreclosure" by Capital City and Mid–Atlantic was "financial and economic embarrassment, including damage to credit, incurring of advice and attorney fees, as well as the personal embarrassment of the advertisement of their property for sale." Capital City did not, in its reply to the opposition (or in its statement of material facts not in genuine dispute), take specific issue with these claims of injury. Nor did the trial judge apparently consider them. If the Osbournes can prove at trial their claim that Capital City intentionally misrepresented the payoff amount and improperly failed to release the trust and cancel the note, they are entitled to submit proof that these actions caused them to incur legal expenses and fees in connection with Capital City's September 1990 attempted foreclosure.[6]

Count three of the complaint, in particular, alleges intentional as opposed to negligent

---

4. The lien remained, however, as a result of the unrelated first trust and First Government's second trust, not due to any action on the part of Capital City.

5. None of the foreclosures, however, have yet to result in a sale of the property.

6. Larry Osbourne also stated in an affidavit that "I suffered much embarrassment from the attempted foreclosure of September 1990 and paid

extra fees (discount points) just to get rid of Capital City." The Osbournes, however, decided to refinance their note with Capital City, and to pay the required fees and points in connection with that refinance, in May 1989. It was that decision that led to the alleged misrepresentation of the payoff amount. Any fees and points paid in connection with the refinance were therefore incurred independent of, not in response to, Capital City's actions with respect to the payoff of the note.

misrepresentation by Capital City with the resultant damages described above.[7] This court has not ruled whether damages for mental and emotional distress are recoverable in a claim for fraud or intentional misrepresentation. Other courts are divided on the issue. *See e.g., Kilduff v. Adams, Inc.,* 219 Conn. 314, 593 A.2d 478, 484 (1991) (emotional damages that are the natural and proximate result of fraud are permissible); *Crowley v. Global Realty, Inc.,* 124 N.H. 814, 474 A.2d 1056, 1058 (1984) (liberal compensatory damages, such as damages for emotional distress, are permissible in an action for intentional misrepresentation where there are allegations and proof of wanton, malicious or oppressive conduct); *Rosener v. Sears, Roebuck & Co.,* 110 Cal.App.3d 740, 168 Cal. Rptr. 237, 246 (Cal.Ct.App.1980), *appeal dismissed,* 450 U.S. 1051, 101 S.Ct. 1772, 68 L.Ed.2d 247 (1981) (where "appellant's wrongdoing clearly contained elements of intentional malfeasance and bad faith," damages for emotional distress and mental suffering were permissible on a claim for fraud); *McRae v. Bolstad,* 32 Wash.App. 173, 646 P.2d 771, 775 (1982), *aff'd,* 101 Wash.2d 161, 676 P.2d 496 (1984) (plaintiff can recover for losses proximately caused by defendant's fraud, including damages for mental suffering); *but see, e.g., Jourdain v. Dineen,* 527 A.2d 1304, 1307 (Me.1987) (pecuniary loss is an essential element of a fraud action and damages for emotional or mental pain and suffering are not recoverable); *Harsche v. Czyz,* 157 Neb. 699, 61 N.W.2d 265, 272–273 (1953) (actual damages are permitted in a cause of action for fraud, recovery for mental anguish is not).

Some courts take the approach that the purpose of fraud or deceit cases is to put the plaintiff in the position that he would have been in had he not been defrauded. For example, in *Cornell v. Wunschel,* 408 N.W.2d 369, 382 (Iowa 1987), in considering damages on a claim for fraudulent misrepresentation, the court noted that emotional distress damages "are not ordinarily contemplated in a business transaction." Since deceit is an economic tort and resembles more a contract claim than a tort claim, the court held that emotional distress damages were not recoverable in fraud actions. Other courts, by contrast, have stressed that fraud is a tort cause of action and that even though it may arise out of a contractual dispute, intentional or reckless conduct justifies a broadened scope of damages. *See, e.g., Rosener v. Sears, Roebuck & Co.,* 168 Cal.Rptr. at 246.

We hold that, upon proof of intentional misrepresentation, a plaintiff may recover "emotional damages that are the natural and proximate result" of the defendant's conduct. *See Kilduff v. Adams, Inc.,* 593 A.2d at 484; *see also Kneip v. Unitedbank–Victoria,* 734 S.W.2d 130, 136 (Tex.App.1987) (permitting recovery in tort for emotional damages which result "directly, naturally and proximately from fraud"); *Holcombe v. Whitaker,* 294 Ala. 430, 318 So.2d 289, 292–93 (1975) (recovery, including emotional damages, permitted for the "ordinary, natural and proximate consequences" of willful tortious action). While the underlying dispute here is contractual in nature, defendants are alleged to have committed an intentional tort when they misrepresented the payoff amount of the note. Whether or not the tort was committed in a contractual context is not dispositive; mental suffering is a "natural and proximate" consequence of intentional fraud and should be a compensable injury. *See id.* 318 So.2d at 293 (since intentional fraudulent conduct is "bound to result in shame, humiliation and mental anguish for the plaintiff," injured party should be entitled to recover for emotional damages on claim for intentional misrepresentation). Thus if the Osbournes can prove intentional misrepresentation by Capital City, as alleged in the complaint, it is not unfair to permit them to recover for any emotional harm that may have occurred as a result of Capital City's actions.

---

7. The Osbournes assert in the complaint, in ¶ 30 of the claim for misrepresentation, that "[d]efendants conduct was wanton and/or willful," and in ¶ 15 they allege that "[d]efendants conduct was willful, oppressive [and] unconscionable."

In addition, the joint pretrial statement contains the assertion that "[p]laintiff claims defendant deliberately failed to give [a] firm payoff amount...."

■ At the same time, we hold that emotional distress damages are not permissible on a claim for negligent misrepresentation. Focusing either on the likely impact of such behavior or on the degree of culpability of the tortfeasor, the justification for compensating for emotional harm is not present when only negligent misrepresentation is involved. *See, e.g., Crowley v. Global Realty, Inc.,* 474 A.2d at 1058 (no recovery for mental distress in a claim for negligent misrepresentation; liberal compensatory damages not allowed without evidence and proof of wanton, malicious and oppressive conduct); *Holcombe v. Whitaker,* 318 So.2d at 293 (unlike negligent conduct, willful and malicious action is bound to result in shame, humiliation and mental anguish).[8] Therefore, if the Osbournes submit proof at trial that Capital City's actions were merely negligent, not intentional, they may not recover damages for emotional harm.

Of course, since the trial court granted summary judgment on counts two and three on the erroneous ground that the Osbournes had alleged no injury at the hands of Capital City, it did not consider the merits of the claim for intentional misrepresentation. The court is therefore free to revisit the issue on remand, and if no evidence of *intentional* conduct has been proffered, summary judgment may be entered for Capital City on the claim for emotional damages.

### B.

■ On the other hand, we agree with the trial court's conclusion that the Osbournes' did not suffer a compensable injury based on the continuing cloud on their title or the possibility of foreclosure on their property. The Osbournes paid nothing to Capital City because of the alleged misrepresentation, since it is Mid–Atlantic that paid the balance of the note,[9] and the Osbournes are not in jeopardy of future injury by Capital City now that it has sold the note to Mid–Atlantic. The Osbournes argue that Capital City's misrepresentation and failure to release the trust was the cause of their current predicament—threatened foreclosure by Mid–Atlantic on a debt in excess of $14,000. But, as the trial judge noted in his order, this action is premature because foreclosure proceedings have been stayed and Mid–Atlantic has not yet demonstrated that it is entitled to collect against the Osbournes. Furthermore, the Osbournes were not injured by Capital City's failure to release the deed of trust because First Government would have succeeded to Capital City's second trust position in any event.[10] And the Osbournes cannot assert on behalf of Mid–Atlantic or First Government any potential claims those parties might have against Capital City for failure to release the deed of trust; nor can they assert against Capital City claims they might have against Mid–Atlantic or First Government for failure to pay off the Capital City loan in full. Summary judgment on counts two and three was therefore proper on the demand for damages resulting from the lien on the property and the possibility of foreclosure in the future.

### IV.

Finally, in count four the Osbournes made two statutory claims under consumer protection statutes, both of which were rejected by the trial court. Essentially for the reasons stated in part III.A., *supra,* summary judg-

8. The Osbournes' reliance on *Jones v. Howard University, Inc.,* 589 A.2d 419 (D.C.1991), for the proposition that emotional harm is recoverable for negligent conduct is entirely misplaced. Under *Jones,* a claim for negligent infliction of emotional distress may be brought, without any accompanying physical injury, if the plaintiff was in the zone of physical danger and defendant's conduct caused him to fear for his own safety. Not only does this line of authority have no relevance to the factual context of this case, but the Osbournes did not plead a claim for negligent infliction of emotional distress in the complaint.

9. It is Mid–Atlantic that would have standing to assert a claim against Capital City to recoup any overpayment on the payoff and purchase of the Note.

10. For count two, appellants also demanded that Capital City release the deed of trust and cancel the note. Such relief cannot be granted in this case where Capital City has already released its rights under the deed of trust and sold the note to Mid–Atlantic. For this relief, the Osbournes have sued the wrong party.

ment was improperly granted on these claims.[11]

██ The Osbournes first rely on D.C.Code § 28–3904 ("Unlawful trade practices"), part of the District of Columbia Consumer Protection Procedures Act, which provides in relevant part:

It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:

\*   \*   \*   \*   \*   \*

(e) misrepresent as to a material fact which has a tendency to mislead....

The Osbournes contend that by misrepresenting the payoff amount Capital City violated this provision whether or not they were damaged thereby.[12] While the Osbournes confuse in this regard the administrative remedies available for redress of such violations and the availability of a court action, they have nevertheless alleged sufficient injury to proceed to trial on this claim. Section 28–3905(k)(1) provides that a consumer must have "suffer[ed] ... damage as a result of the use or employment ... of [an unlawful] trade practice" in order to bring an action in the Superior Court for such violation. Therefore, if the Osbournes can prove that Capital City made a material misrepresentation and that they suffered damages as a result, they may seek relief under § 28–3904(e).

██ The Osbournes' claim under § 28–3312 also requires proof of damages. That section, part of the Interest Rate Ceiling Amendment Act of 1983, provides in relevant part:

It shall be a violation of this chapter for any lender to:

(1) misrepresent as to a material fact; [or]

(2) fail to state a material fact....

On its face, the statute is ambiguous as to whether proof of damages is required, for § 28–3314 provides:

Any borrower who suffers a violation of any provision of this chapter by any lender may bring an action in the Superior Court ... to recover or obtain or enforce any of the following:

(1) reasonable attorney's fees;

(2) actual *and* punitive damages; or

(3) any other relief which the court deems proper. [Emphasis added.]

But the legislative history leaves no doubt that by the conjunctive phrase "actual and punitive damages" the Council of the District of Columbia meant proof of actual damages to be a condition of "any other relief," including punitive damages. The Report of the Committee on Finance and Revenue on Bill 5–193, "Interest Rate Ceiling Amendment Act of 1983," states, at p. 11:

To ... ensure that these important consumer protections are enforced, Bill 5–193 ... provides that any borrower *who suffers damages as a result* of a lender's violation of any provision of this chapter may sue in Superior Court to recover or obtain or enforce any of the following:

1. reasonable attorney fees;

2. punitive damages; and

3. any other relief which the court deems proper. [Emphasis added.]

*See also id.* at 20 ("The new section 28–3314 provides a right of action to any borrower who suffers damage as a result of borrower's [*sic*; lender's] violation of any provision of this chapter"). Thus, if the Osbournes are able to demonstrate that they were harmed

---

11. We express no opinion here on whether the cause for misrepresentation under these statutes requires proof of intentional misrepresentation.

12. In granting summary judgment, the trial court considered together count one (breach of contract) and count four (unfair and deceptive trade practices). This was likely due to the language in count four of the complaint which states that Capital City's "conduct was a continuous pattern of deception, misrepresentation, concealment, overreaching and unconscionable practices." The parties, however, in their pleadings on summary judgment and in their briefs on appeal are more specific in their understanding that the misrepresentation forming the basis of this claim is Capital City's alleged misrepresentation of the payoff amount and/or its failure to inform the Osbournes of the insufficiency of the tendered payoff.

by the alleged misrepresentation, they may seek relief for this statutory claim as well.[13]

*Judgment reversed in part and affirmed in part; case remanded for further proceedings consistent with this opinion.*

**13.** The Osbournes also allege violations of D.C.Code § 28–3904(r)(5), proscribing "knowingly tak[ing] advantage of the inability of the consumer reasonably to protect his interests." Id. There are no facts in this case to support such an allegation.