Lillie May DeBERRY, Appellant,

v.

FIRST GOVERNMENT MORTGAGE
AND INVESTORS CORP.,
Appellee.

No. 99–SP–411.

District of Columbia Court of Appeals.

Argued Nov. 4, 1999.

Decided Dec. 30, 1999.

Mark L. Hessel, with whom Marc H.
Sliffman; and Mark L. Leemon, Kensing-
ton, MD, were on the brief, for appellant.

Nathan I. Finkelstein, with whom Lau-
rie B. Horvitz, Bethesda, MD, was on the
brief, for appellee.

Jo Anne Robinson, Interim Corporation
Counsel, Charles L. Reischel, Deputy Cor-
poration Counsel, and Bennett Rushkoff,
Senior Counsel, filed a brief as amicus
curiae for the District of Columbia.

Before FARRELL and REID, Associate
Judges, and MACK, Senior Judge.

FARRELL, Associate Judge:

The present appeal and certified ques-
tion concern the scope of the provision of
the District of Columbia Consumer Protec-
tion Procedures Act ("CPPA" or "the
Act")[1] that declares it an "unlawful trade
practice" for a person to "make or enforce
unconscionable terms or provisions of sales
or leases." D.C.Code § 28–3904(r). Spe-
cifically, the United States Court of Ap-
peals for the District of Columbia Circuit
has certified to this court the question:
"Does D.C.Code § 28–3904(r) apply to real
estate mortgage finance transactions?"[2]
The question arises in the following con-
text described in the Circuit Court's opin-
ion accompanying the certification:

> [Plaintiff-appellant] DeBerry inherited
> her home in 1981. In April of 1991, she
> borrowed $10,000 from [defendant-ap-
> pellee] First Government [Mortgage and

---

1. D.C.Code §§ 28–3901 to –3909 (1996).

2. The certification is made pursuant to
   D.C.Code § 11–723 (1995). The Circuit

Court's opinion certifying the issue is report-
ed at 335 U.S.App.D.C. 173, 170 F.3d 1105
(1999).

Investors Corporation ("First Government")], secured by a deed of trust on her home. In August of 1992, First Government refinanced the debt on Ms. DeBerry's home, loaning her $16,500. On April 13, 1995, Ms. DeBerry again refinanced her home by borrowing $21,000 from First Government.... In December of 1995, First Government made a final loan to Ms. DeBerry for $45,000.

On April 15, 1996, Ms. DeBerry filed this action against First Government. Ms. DeBerry alleged that in financing the four loans, First Government had violated the [CPPA]. Specifically, Ms. DeBerry alleged a violation of D.C.Code § 28–3904(r)(1) and § 28–3904(r)(5).[3]

\* \* \* \* \* \*

Ms. DeBerry claims that for each of these loans, she was charged a large percentage of the amount borrowed in points and other fees. For example, with respect to the 1991 loan, Ms. DeBerry claims that she was charged $2,540 to borrow $10,000. Ms. DeBerry alleges that the loans made by First Government were unconscionable in that they constituted a pattern and practice of reverse redlining which she defines as "a predatory lending practice of making high cost loans to unsophisticated homeowners who have little money but do have substantial equity in their homes." [Footnotes omitted.]

As is apparent, Ms. DeBerry did not engage in real estate mortgage finance transactions with First Government in the traditional sense of financing the purchase of real estate. Indeed, the credit she received did not accompany the sale of any property, real or personal. The question we must decide is whether First Govern-

ment is correct in arguing that only such extensions of credit—those associated with the sale or lease of real or personal property—are within the reach of § 28–3904(r). We begin by observing, as we have before, that the CPPA is, "to say the least, an ambitious piece of legislation," *Howard v. Riggs Nat'l Bank,* 432 A.2d 701, 708 (D.C. 1981), with broad remedial purposes. *See* D.C.Code § 28–3904(b). It "prohibit[s] a long list of 'unlawful trade practices,'" *Howard,* 432 A.2d at 708, and in doing so defines its terms comprehensively in keeping with the purpose to "assure that a just mechanism exists to remedy *all* improper trade practices." Section 28–3901(b)(1) (emphasis added). Examination of those terms convinces us that § 28–2904(r) applies to extensions of consumer credit such as Ms. DeBerry obtained from First Government.

The first relevant statutory term, a "trade practice," is defined as "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a *sale, lease or transfer, of consumer goods or services.*" Section 28–3901(a)(6) (emphasis added). "Unlawful" trade practices are enumerated in § 28–3904, including subsection (r), which prohibits the making or enforcing of "unconscionable terms or provisions of sales or leases." Because subsection (r) relates to provisions of "sales or leases" and a trade practice includes the "sale, lease or transfer ... of consumer goods or services," obviously is critical to our analysis. D.C.Code § 28–3901(a)(7) defines "goods and services" broadly to mean:

any and all parts of the economic output of society, at any stage or related or

3.  D.C.Code § 28–3904(r)(1) and (5) provide that it is a violation of the chapter (an "unlawful trade practice") to:
    (r) made or enforce unconscionable terms or provisions of sales or leases; in applying this subsection, consideration shall be given to the following, and other factors:
    (1) knowledge by the person at the time credit sales are consummated that there

was no reasonable probability of payment in full of the obligation by the consumer;
    . . . .
    (5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement....

necessary point in the economic process, and includes *consumer credit,* franchises, business opportunities, *real estate transactions, and consumer services of all types.* [Emphases added.]

So, for instance, "any act ... [of] provid[ing] information about" or "offer[ing] for ... sale" consumer credit would seem to be a "trade practice," as is "any act ... effectuat[ing]" a real estate transaction and any "sale" of consumer services "of [any] type[ ]." Nevertheless, First Government points out that the Act does not define "sales or leases"—the subject matter of § 28–3904(r)—and argues that common business usage is quite inconsistent with the notion of a sale (rather than a loan) of money. *See, e.g., Alworth–Washburn Co. v. Helvering,* 62 App.D.C. 322, 324, 67 F.2d 694, 696 (1933) ("[T]he word 'loan' implies an advance of money upon an absolute promise to repay"; "a 'sale' [is] an absolute transfer of property or something of value from one person to another for a valuable consideration"). First Government further notes that the terms "goods" and/or "services" appear in nearly all of the prohibited trade practices in § 28–3904, but not subsection (r)—the implication being that "sale[ ]" as employed there is not a sale of "goods and services" as broadly defined in § 28–3901(a)(7).

This attempt to decouple "sale" from the Act's broad definition of "goods and services" is unpersuasive.[4] First of all, as the Circuit Court reasoned in certifying the issue, a reader inquiring what "sales or leases" means in subsection (r) will naturally ask, "sale or lease of what?"[5] The answer the Act provides is "goods and services" as defined in § 28–3901(a)(7). Linking the two provisions further (besides the definition of a "trade practice" already mentioned) are the definitions of a "consumer," § 28–3901(a)(2) ("a person who ... purchase[s], lease[s] (from), or receive[s] consumer goods or services"), and a "merchant," § 28–3091(a)(3) ("a person who ... sell[s], lease[s] (to), or transer[s] ... consumer goods or services"). The last definition is particularly instructive because, as this court has held, the trade practices prohibited by § 28–3904, including subsection (r), can be committed only by a "merchant," as defined. *See Howard,* 432 A.2d at 709. A sale or lease under subsection (r) is thus inextricably linked to the Act's definition of "goods and services." And the fact that (r), unlike most other provisions of § 28–3904, does not explicitly refer to goods or services is explained by the fact that it, almost alone, is concerned with the contractual bargain itself—"unconscionable terms or provisions of sales"—rather than the *things* bargained for, *i.e.,* goods or services.

■ We conclude that, although Ms. DeBerry did not buy her home from (or through) First Government, she purchased "consumer credit" within the meaning of the Act.[6] *See Jackson v. Culinary School of Washington,* 788 F.Supp. 1233, 1253 (D.D.C.1992) (applying § 28–3904(r) to extension of consumer credit, holding that a "merchant includes one who sells consumer credit as well as those entities which take an assignment of the credit account and continue the extension of credit to the consumer" ), *rev'd on other grounds,* 307 U.S.App.D.C. 123, 27 F.3d 573 (1994);

---

4. In *Osbourne v. Capital City Mortgage Corp.,* 667 A.2d 1321, 1331 n. 13 (D.C.1995), we assumed application of the unconscionability clause (subsection (r)) to mortgage finance transactions of the kind involved here, concluding only that there were "no facts in [the] case to support ... [the] allegation [of unconscionability]." However, the brevity of our discussion on the point and the fact that applicability of subsection (r) does not appear to have been raised as an issue make us reluctant to rely on *Osbourne* as precedent.

5. *See* 335 U.S.App.D.C. at 177, 170 F.3d at 1109.

6. Used "as an adjective, 'consumer' describes anything, without exception, which is primarily for personal, household, or family use ." D.C.Code § 28–3901(a)(2). Ms. DeBerry may also have purchased a "consumer service[ ]," an issue we need not decide.

*Lawson v. Nationwide Mortgage Corp.,* 628 F.Supp. 804, 807 (D.D.C.1986) (holding that mortgage refinancing transaction was covered by the CPPA because the Act "specifically encompasses such 'consumer credit' transactions"). In resisting this conclusion, First Government points out that consumer protection laws in the District pre-dating the CPPA applied only to consumer credit associated with the purchase of goods and services. But this argument ignores the sweep with which the Council in the CPPA defined the subject matter of "trade practices" as "any and all parts of the economic output of society, at any stage or related or necessary point in the economic process." Section 28–3901(a)(7); *see* REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SERVICES AND CONSUMER AFFAIRS, ON BILL 1–253, "THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT," at 14 (March 24, 1976) (1976 Report) (defining "goods and services" as "the subject matter of any trade practice, including *any action normally considered only incidental to the supply of goods and services to consumers* " (emphasis added)). Nor are we persuaded by the arguments that other statutes (*e.g.,* D.C.Code § 28–3312) cover *other* unlawful practices by lenders, or that legislative history accompanying *later* statutes reflects an assumption by Council members that mortgage loans are not reached by the CPPA.[7] *See Consumer Product Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 117–18, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (" '[T]he views of a subsequent [legislature] form a hazardous basis for inferring the intent of an earlier one' ") (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960)). Even First Govern-

ment does not seriously dispute that *some* mortgage loans—those accompanying the sale of goods and services traditionally understood—are reached by the Act.

Furthermore, First Government's sale of consumer credit to Ms. DeBerry had significant aspects of a "real estate transaction" in that she mortgaged her home to the lender as security for the loan. Although the transfer of ownership in trust gave First Government only a "qualified fee simple" interest, D.C.Code § 45–703 (1996), sometimes termed "a naked legal title," *Marshall v. Kraak,* 23 App.D.C. 129, 132 (1904), the mortgage had the legal effect of encumbering and (according to the allegations) the practical effect of jeopardizing her ownership of the home. First Government, pointing to legislative history, argues that when the Council added "real estate transactions" to the definition of "goods and services" in 1990,[8] it intended to address only transactions involving the purchase of real property. But the relevant committee report is not nearly so conclusive on the point. While the Council chose the broad phrase "real estate transactions" (the phrase originally proposed had been "the sale of residential real estate") primarily because the difference between sales and lease arrangements "is hard to discern," REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON CONSUMER AND REGULATORY AFFAIRS, ON BILL 8–11, at 3 (1990), it nonetheless intended "to include *all* real estate transactions" within the reach of the Act. *Id.* (emphasis added). That the report did not mention real estate mortgage financing specifically may reflect nothing more than the Council's recognition that "consumer credit" was already covered.[9]

---

**7.** *See* REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON FINANCE AND REVENUE, ON BILL 5–193, THE INTEREST RATE CEILING AMENDMENT ACT OF 1983, at 16 (October 20, 1983).

**8.** The amendment was in response to this court's decision in *Owens v. Curtis,* 432 A.2d 737, 739 (D.C.1981), holding that the CPPA did not apply to the sale of real estate. *See*

*Schiff v. American Ass'n of Retired Persons,* 697 A.2d 1193, 1197 n. 10 (D.C.1997).

**9.** As First Government acknowledges, the *Owens* decision prompting the amendment had concerned a dispute between the buyer and seller of real property, and did not involve mortgage lenders. *Owens, supra* note 8, 432 A.2d at 738.

■ In the CPPA, the Council declared its opposition to unconscionable credit transactions exploiting a consumer's likely inability to make payment in full or otherwise protect her interests. Section 28–3904(r)(1) & (5). The mischief represented by that practice obviously exists whether mortgage financing accompanies the sale of property or is itself the subject matter of the transaction. Given the Council's broad remedial purpose, First Government has the burden of persuading us that in subsection (r) it meant to address unconscionability only in the one context and not the other—with respect to credit that is "incidental to the supply of goods and services to consumers" (1976 Report, *supra*) but no other kind. First Government has not met that burden. We therefore hold that D.C.Code § 28–3904(r) applies to real estate mortgage finance transactions.

The Clerk shall transmit this answer to the certified question to the District of Columbia Circuit Court.

*So ordered.*