225 F.3d 738 (D.C. Cir. 2000)
 Brad Williams, Appellee/Cross-Appellant
v.
First Government Mortgage and Investors Corporation, Appellant/Cross-Appellee
Industry Mortgage Company, Appellant/Cross-Appellee
 Nos. 97-7195, 97-7243
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued December 11, 1998
Decided August 1, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Appeals from the United States District Court for the District of Columbia (No. 96cv00708) (No. 96cv01993)
 Nathan I. Finkelstein and Laurie B. Horvitz argued the cause and filed the briefs for appellants/cross-appellees.
 Rachel Mariner argued the cause for Brad Williams as appellee. Nina F. Simon argued the cause for Brad Williams as cross-appellant. With them on the briefs was Jean Constantine-Davis.
 Before: Wald,* Tatel and Garland, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Tatel.
 Tatel, Circuit Judge:
 
 
 1
 Brad Williams refinanced his Washington, D.C. home with First Government Mortgage and Investors Corporation. Unable to make his monthly payments and threatened with foreclosure, Williams sued First Government, raising common law and both state and federal statutory causes of action. A jury found First Government liable under the D.C. Consumer Protection Procedures Act and awarded damages. The district court trebled the damages, denied Williams's common law unconscionability and federal Truth in Lending Act claims, and awarded him substantial attorneys' fees. Both sides appealed. Because the District of Columbia Court of Appeals has squarely held that the D.C. Consumer Protection Procedures Act applies to home mortgage transactions, and because we find sufficient evidence in the record to support the jury's verdict, we affirm the award of damages. We also affirm the district court's judgment that the attorneys' fee award, though disproportionate to the amount of damages recovered, was reasonable in relation to Williams's success in the litigation. Finally, we affirm the district court's dismissal of Williams's Truth in Lending Act claims, but remand his common law unconscionability claim for the district court to clarify whether he lacked "meaningful choice" when he agreed to the terms of the loan.
 
 
 2
 * The facts of this case are set forth in detail in Williams v. First Gov't Mortgage & Investors Corp., 176 F.3d 497 (D.C. Cir. 1999). In summary, appellee and cross-appellant Brad Williams, a 61 year old retired painter and handyman, has owned his home in Northeast Washington, D.C. for 29 years.In 1994, Williams had a $42,000 mortgage from Central Money Mortgage Company. He paid $587 per month. Because he owed $1,400 in unpaid property taxes, the D.C. government advertised his house for auction in a tax sale.Short on cash, Williams went to several lenders, including seven banks, seeking a $1,400 loan to pay his taxes. Most would not give him credit because his income was too low.
 
 
 3
 First Government Mortgage and Investors Corporation, appellant and cross-appellee, offered to help Williams, though not by loaning him the $1,400 he needed to make the payment. Instead, First Government offered to refinance his entire mortgage through a 30-year loan for $58,300 with a 13.9 percent interest rate and $686 monthly payments. Although the monthly payment was $100 more than he had been paying, and although the term of the loan was longer than he wanted,Williams reluctantly took the loan, believing that he had no other alternative to foreclosure. Most of the loan, $42,913, paid off his existing mortgage; $7,596 covered various fees; $1,609 covered his taxes; $1,273 went to pay for a two-year life insurance policy; the remaining $4,909 eventually went toward his monthly payments.
 
 
 4
 At the time of the loan settlement, Williams was receiving $1,072 a month in disability benefits, $100 of which went to health insurance, plus up to $3,000 a year from part-time work. At most he had roughly $1,200 a month in disposable income, over half of which went to First Government to cover his $686 monthly payments. This left little more than $500 each month to buy necessities for himself and his dependents.With 11 children and 23 grandchildren, Williams testified that his household had at least seven people in it at any given time.
 
 
 5
 He kept up with his loan payments for 12 months, but his financial circumstances steadily worsened. He began to run out of food by the latter part of each month. His electricity, gas, and water were cut off. He eventually fell behind on his loan payments. In August 1996, Industry Mortgage Company (to whom First Government had assigned the loan) served him with a foreclosure notice demanding $63,831.
 
 
 6
 Williams filed suit in the United States District Court for the District of Columbia, seeking to enjoin the foreclosure, to rescind the loan, and to obtain damages pursuant to statutory and common law causes of action. Among other things, he claimed: (1) that First Government violated section 283904(r) of the D.C. Consumer Protection Procedures Act ("CPPA") by knowingly taking advantage of his inability to protect his interests in the loan transaction or by knowingly making him a loan he could not repay with any reasonable probability; (2) that First Government violated the common law doctrine of unconscionability articulated in Williams v. Walker-Thomas Furniture Co., 350 F.2d 445 (D.C. Cir. 1965);and (3) that First Government violated the federal Truth in Lending Act ("TILA") by failing to disclose the life insurance premium as a finance charge and by failing to give him timely notice of his right to cancel the loan. First Government moved for summary judgment, arguing that the CPPA did not apply to home mortgage loans. The district court denied the motion. See Williams v. Central Money Co., 974 F. Supp. 22, 27 (D.D.C. 1997) ("Williams I").
 
 
 7
 After a five-day trial, the jury returned a verdict in favor of Williams on his CPPA claim in the amount of $8,400. Finding the evidence sufficient to sustain the verdict, the district court denied First Government's motion for judgment notwithstanding the verdict. See Williams v. First Gov't Mortgage & Investors Corp., 974 F. Supp. 17, 22 (D.D.C. 1997) ("Williams II"). After trebling the jury's award to $25,200, as authorized by section 28-3905(k)(1) of the CPPA, the district court denied Williams's common law unconscionability and TILA claims. See id. at 18-22. Williams then filed a motion seeking $199,340 in attorneys' fees. The district court awarded him the entire amount. See Williams v. Central Money Co., No. 96-1993 (D.D.C. Jan. 28, 1998) ("Fees Order II"); Williams v. Central Money Co., No. 96-1993 (D.D.C. Oct. 1, 1997) ("Fees Order I"). Both sides appealed.
 
 
 8
 Oral argument in this case was heard on the same day as DeBerry v. First Gov't Mortgage & Investors Corp., 170 F.3d 1105 (D.C. Cir. 1999) amended, 225 F.3d 725 (D.C. Cir. 2000) a case also involving a claim by First Government that the CPPA does not apply to home mortgage transactions. Because local D.C. courts had "not ruled directly on this issue and because the answer will have significant effects on District of Columbia mortgage finance practice," we certified the following question to the D.C. Court of Appeals: "Does D.C. Code § 28-3904(r) apply to realestate mortgage finance transactions?" Id. at 1110. In the meantime, we disposed of First Government's claims that Maryland law, not the CPPA, governs the loan it made to Williams and that TILA preempts the CPPA. See Williams, 176 F.3d at 499-500.
 
 
 9
 On December 30, 1999, the D.C. Court of Appeals answered the certified question, holding that section 28-3904(r) of the CPPA does apply to real estate mortgage finance transactions. DeBerry v. First Gov't Mortgage & Investors Corp., 743 A.2d 699, 703 (D.C. 1999), reh'g en banc denied (May 16, 2000). We address First Government's remaining claims in section II of this opinion. In section III, we address Williams's cross appeal.
 
 II
 
 10
 First Government argues that the evidence is insufficient to support the jury's finding of liability and award of damages under the CPPA. It also challenges the award of attorneys' fees to Williams. We discuss each argument in turn.
 
 Sufficiency of evidence
 
 11
 The district court instructed the jury that it could find CPPA liability on one of two grounds: either that First Government made Williams a loan that it knew he could not repay, see D.C. Code Ann. § 28-3904(r)(1), or that First Government took advantage of Williams's inability to protect his interests in the transaction, see id. § 28-3904(r)(5). Our role in reviewing the jury's verdict in Williams's favor and the district court's denial of First Government's motion for judgment notwithstanding the verdict is "very limited." Ferebee v. Chevron Chem. Co., 736 F.2d 1529, 1534 (D.C. Cir. 1984).
 
 
 12
 The jury's verdict must stand unless the evidence, together with all inferences that can reasonably be drawn there from is so one-sided that reasonable [persons] could not disagree on the verdict. The appellate court does not assess witness credibility nor weigh the evidence, but rather seeks to verify only that fair-minded jurors could reach the verdict rendered.
 
 
 13
 Id. (citations and internal quotation marks omitted).
 
 
 14
 Applying this highly deferential standard, we think "fairminded jurors" could find First Government liable under either subsection (r)(1) or subsection (r)(5). Williams testified that he informed First Government that he received approximately $900 in monthly disability benefits and no more than $3,000 a year from part-time work. See Trial Tr. 5/12/97 ("Tr.") at 96-97. Although Williams's loan application indicated that he earned $500 a month in addition to his monthly check, Williams testified not only that he never gave that figure to First Government, but also that First Government "lied" when it wrote that figure on his application. Id. at 100.From this testimony, a reasonable jury could easily find that First Government knew that Williams's income was no more than $1,200 a month. From other evidence in the record, a reasonable jury could also find that First Government knew that Williams was disabled, that he was getting older, and that he would be unable to supplement his fixed income with earnings from part-time work throughout the 30-year term of the loan. We find that a reasonable jury could conclude that First Government made the loan to Williams knowing "there was no reasonable probability of payment in full of the obligation." D.C. Code Ann. § 28-3904(r)(1).
 
 
 15
 We likewise find that a reasonable jury applying subsection (r)(5) could conclude that Williams was unable fully to understand the transaction and that First Government "knowingly [took] advantage of [his] inability ... reasonably to protect his interests." Id. § 28-3904(r)(5). Williams testified that he had only a sixth-grade education from the segregated schools of Savannah, Georgia, see Tr. at 40-41, that he could read no more than 40 percent of a newspaper, see id. at 90, that he only recently learned through tutoring "what S means at the end of the word" and "what a capital letter means," id. at 4344, that he thought an interest rate of 13.90 percent exceeded 13.9 percent, see id. at 173-74, and that when he bought his house in 1970, he "depended on [his wife] basically to do most of [his] reading [at the closing] 'cause she had an 11th grade education," id. at 43. Williams also testified that during his 20-minute meeting with First Government to settle the loan, the loan officers neither explained the papers he signed nor gave him time to review the papers or any papers to take home. See id. at 60-61, 142-44, 183. First Government points to testimony suggesting that Williams had considerable experience and familiarity with mortgage transactions. Our role, however, does not include weighing the evidence. See Ferebee, 736 F.2d at 1534. Instead, we need only satisfy ourselves that "fair-minded jurors could reach the verdict rendered." Id. In this case, the evidence is sufficient for a reasonable jury to find liability under subsection (r)(5).
 
 
 16
 First Government next claims that the evidence does not support the jury's award of damages, pointing out that the terms of the loan were calibrated to the risk Williams posed as a borrower and that Williams was unable to secure better terms from other lenders. But the amount of damages turns not on whether Williams had better options or whether the terms of the loan met industry standards, but rather, as the district court instructed the jury, on whether "Mr. Williams lost money as a result of unlawful acts of First Government."Tr. at 816 (emphasis added). Upon finding that First Government unlawfully made Williams a loan that he either could not repay or did not understand, the jury had ample basis for awarding $8,400 in damages. After all, First Government collected over $7,500 in fees and expenses, and charged Williams $100 per month more than he had been paying under his previous mortgage.
 
 
 17
 Nor do we find merit in First Government's complaint that the district court articulated no factual basis for trebling the damages and improperly awarded Williams both treble damages and attorneys' fees. Once it is established that a "consumer [has] suffer[ed] any damage," the CPPA authorizes courts to treble damages without further findings. D.C. Code Ann. § 28-3905(k)(1)(A) (1996). Moreover, at the time First Government made the loan, the CPPA provided that plaintiffs may "recover or obtain any of the following: (A) treble damages; (B) reasonable attorneys' fees; (C) punitive damages; (D) any other relief which the court deems proper."Id. § 28-3905(k)(1) (amended 1998). The word "any," together with the absence of the word "or" between options (A) through (D), indicates that courts may award any one or any combination of the listed remedies. See District of Columbia Committee on Public Services and Consumer Affairs, Report on Bill 1-253, the District of Columbia Consumer Protection Procedures Act 23 (1976) ("Treble damages and reasonable attorneys' fees are recoverable in order to encourage the private bar to take such cases.").
 
 Attorneys' fees
 
 18
 Williams's original suit in district court named four defendants (First Government, Industry Mortgage, Central Money, and Charles Hardesty) and alleged five causes of action (common law fraud, common law unconscionability, CPPA, TILA, and D.C. usury law). After settling with two defendants (Central Money and Charles Hardesty), Williams went to trial against First Government and Industry Mortgage, the assignee of the loan. Following the jury verdict in his favor and the district court's subsequent orders, Williams submitted a fee request calculated as follows: Starting with the total amount of fees generated by the suit, Williams's attorneys cut in half all feesincurred prior to settlement with Central Money and Charles Hardesty, thus excluding fees attributable to work performed against the two settling defendants. His attorneys then excluded fees associated with the TILA and usury claims, as well as post-trial fees associated with the unconscionability claim. Thus, according to Williams, the $199,340 fee request, which the district court granted in full, reflects half of all fees associated with the fraud, CPPA, and unconscionability claims prior to settlement, plus the entire amount of such fees after settlement up to the end of trial. "[A]n attorney's fee award by the District Court will be upset on appeal only if it represents an abuse of discretion." Copeland v. Marshall, 641 F.2d 880, 901 (D.C. Cir. 1980) (en banc).
 
 
 19
 Under settled law, Williams may recover fees only for work related to the claim on which he prevailed, and the fees awarded on that claim must be reasonable in relation to the success achieved. See Hensley v. Eckerhart, 461 U.S. 424, 434 (1983). Pointing out that Williams's fee request actually included time for work on the TILA claims, First Government argues that the TILA and fraud claims were unrelated to the CPPA and unconscionability claims. The latter, it says, involved Williams's ability to understand the transaction and to pay off the loan, while the former involved the accuracy and completeness of First Government's disclosures and representations to Williams. Disagreeing with First Government, the district court explained that "all the claims against all defendants involved a 'common core of facts' and 'related legal theories.' " Fees Order I at 3 (quoting Hensley, 461 U.S. at 435). "For example," the district court said, "the sale of insurance to plaintiff ... was a common denominator of plaintiff's [TILA] theory, its fraud theory, and its D.C. statutory claims. The overlap was certainly enough to justify the basic approach of plaintiff's counsel [in calculating the fee request]." Fees Order II at 1-2.
 
 
 20
 In Morgan v. District of Columbia, we said that "[f]ees for time spent on claims that ultimately were unsuccessful should be excluded only when the claims are 'distinctly different' in all respects, both legal and factual, from plaintiff's successful claims." 824 F.2d 1049, 1066 (D.C. Cir. 1987) (quoting Hensley, 461 U.S. at 434). Recognizing that "there is no certain method of determining when claims are 'related' or 'unrelated,' " Hensley, 461 U.S. at 437 n.12, we find no basis for believing that the district court abused its discretion in concluding that the TILA and fraud claims were not " 'distinctly different in all respects' " from the CPPA and unconscionability claims. Fees Order II at 1 (quoting Morgan, 824 F.2d at 1066). Indeed, considering the overlap among Williams's various common law and statutory causes of action, we agree with the district court that "[m]uch of the work done by plaintiff's counsel would have been required to litigate any one of his claims against any single defendant." Fees Order I at 3.
 
 
 21
 First Government next argues that the district court abused its discretion by awarding fees disproportionate to the damages Williams recovered. Relying on pre-trial estimates of the dollar value of the suit provided by Williams's attorneys, First Government argues that because the $25,200 award amounted to only 10 to 15 percent of Williams's litigation objectives, the district court should have awarded no more than 10 to 15 percent of the attorneys' fees requested.Again, the district court disagreed, stating "while the relief plaintiff obtained was not what he originally sought in dollar terms, the fee requested is not unreasonable in relation to that recovery." Id.
 
 
 22
 In Hensley, the Supreme Court rejected a " 'mathematical approach' " similar to that proposed by First Government, 461 U.S. at 435 n.11 (citation omitted), noting that "[t]here is no precise rule or formula" for determining the reasonableness of the relation between the fee requested and the relief obtained, id. at 436. Here, the district court found the fees reasonable, considering not only the damages Williams recovered, which will prevent his immediate expulsion from his home and will likely help save his home in the long run, but also "[t]he vindication of rights, whether constitutional or statutory." Fees Order II at 2. Like the plaintiffs in City of Riverside v. Rivera, who received a $245,000 fee award that was more than seven times the $33,000 in damages they recovered under a federal civil rights statute, Williams "seeks to vindicate important civil ... rights that cannot be valued solely in monetary terms." 477 U.S. 561, 574 (1986) (plurality opinion). Affirming the fee award in Rivera, the Supreme Court held that fees awarded under 42 U.S.C. § 1988 need not be proportionate to the amount of damages recovered in order to satisfy Hensley's reasonableness standard. See id. at 580 (plurality opinion); id. at 585 (Powell, J., concurring in the judgment). Given the public policy interests served by the CPPA, see DeBerry, 743 A.2d at 703, we decline to read a "rule of proportionality" into that statute. Such a rule "would make it difficult, if not impossible, for individuals with meritorious ... claims but relatively small potential damages to obtain redress from the courts." Rivera, 477 U.S. at 578 (plurality opinion). Thus, although Williams's fee award is disproportionate to the damages he recovered, the district court did not abuse its discretion in concluding that the fees requested were "reasonable in relation to the success achieved." Hensley, 461 U.S. at 436.
 
 
 23
 First Government challenges the calculation of the fee in several other respects, claiming among other things that Williams's attorneys failed to exercise billing judgment, overstaffed the case, and incurred unnecessary costs due to their alleged lack of trial experience. Having carefully considered each claim, we think none requires discussion. As we have said before, "[w]e customarily defer to the District Court's judgment because an appellate court is not well situated to assess the course of litigation and the quality of counsel."Morgan, 824 F.2d at 1065. By contrast, the district court "closely monitors the litigation on a day-to-day basis," id. at 1065-66, "presid[ing] at numerous motions, discovery disputes, and chambers conferences, as well as at the pretrial conference and trial," id. at 1066 (internal quotation marks and citation omitted). See also Hensley, 461 U.S. at 437 (district court has "superior understanding of the litigation")."[I]ll-positioned to second guess [its] determination," Morgan, 824 F.2d at 1066, we need only verify that the district court "provide[d] a concise but clear explanation of its reasons for the fee award," Hensley, 461 U.S. at 437. Because the district court in this case did just that, we see no basis for disturbing Williams's fee award.
 
 
 24
 ***
 
 
 25
 Having thoroughly considered First Government's other claims, including its challenges to various evidentiary rulings by the district court, and finding none persuasive, we affirm the district court's judgments against First Government in all respects.
 
 III
 
 26
 As cross-appellant, Williams argues that the district court violated his constitutional right to a jury trial by rejecting his unconscionability claim after the jury had determined that the loan was unconscionable under the CPPA; that the district court misapplied the common law doctrine of unconscionability; and that it erred as a matter of law in dismissing his TILA claims. Because these claims present issues of law, our review is de novo. See Pierce v. Underwood, 487 U.S. 552,558 (1988).
 
 Common law unconscionability
 
 27
 After the jury found First Government liable under section 28-3904(r) of the CPPA, which prohibits sales or leases with "unconscionable terms or provisions," the district court rejected Williams's equitable claim of common law unconscionability. Relying on the proposition that the Seventh Amendment right to trial by jury guarantees that a jury's determination of factual issues common to legal and equitable claims "governs the entire case," Bouchet v. National Urban League, 730 F.2d 799, 803 (D.C. Cir. 1984), Williams argues that the jury's finding of statutory unconscionability compelled the district court to find common law unconscionability as well. We disagree.
 
 
 28
 Liability for common law unconscionability requires two findings: "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." Walker-Thomas, 350 F.2d at 449. Liability for statutory unconscionability in this case required one of two findings: either that First Government knew Williams would be unable to repay the loan, see D.C. Code Ann. § 28-3904(r)(1), or that it took advantage of his inability to protect his interests in the loan transaction, see id. § 28-3904(r)(5). Of course, a finding of liability under either subsection (r)(1) or subsection (r)(5) would be highly probative of common law unconscionability. But because the jury was not asked to specify which provision it applied in reaching its verdict (Williams never requested such an instruction), "nobody can say what the jury found the facts to be." Williams II, 974 F. Supp. at 19. The jury's verdict can
 
 
 29
 thus have no binding effect on the district court's subsequent factfinding.
 
 
 30
 Independent of his Seventh Amendment claim, Williams argues that the district court misapplied the "absence of meaningful choice" standard articulated in Walker-Thomas. That case identified a range of factors that courts should consider in determining whether a party to a transaction lacks "meaningful choice":
 
 
 31
 Whether a meaningful choice is present in a particularcase can only be determined by consideration of all the circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power. The manner in which the contract was entered is also relevant to this consideration. Did each party to the contract, consider-ing his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, orwere the important terms hidden in a maze of fine print and minimized by deceptive sales practices? Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his con-sent, or even an objective manifestation of his consent, was ever given to all the terms.
 
 
 32
 350 F.2d at 449 (footnotes omitted); see also Diamond Housing Corp. v. Robinson, 257 A.2d 492, 493 (D.C. 1969) (allowing factfinder to find " 'absence of meaningful choice' because of appellee's unequal bargaining power and her ignorance of the meaning of the lease provisions").
 
 
 33
 After finding the terms of the loan unreasonably favorable to First Government, the district court offered the following analysis of whether Williams lacked "meaningful choice":
 
 
 34
 Williams' argument on the lack of meaningful choice proceeds from his assertion that he was under time pressure either to pay his D.C. property taxes or suffer the tax sale of his home. The notice of an impending tax sale undoubtedly motivated Williams' decision, but it did not deprive him of meaningful choice. Williams had known for weeks that a tax sale on his home was scheduled. The sale was not proven to be imminent.
 
 
 35
 Williams II, 974 F. Supp. at 19. The district court went on to say:
 
 
 36
 Moreover, Williams had substantial experience in finding mortgage loans and had been actively shopping for a loan in the weeks before his entry into the agreement with First Government. Williams' testimony that he was upset by the terms of the loan, which plaintiff now argues demonstrates his lack of meaningful choice, actually tends to prove the contrary proposition: that he knew what he was doing and did it voluntarily.
 
 
 37
 Id. According to Williams, the district court failed to consider "all the circumstances surrounding the transaction," Walker-Thomas, 350 F.2d at 449--in particular, his lack of education and limited literacy.
 
 
 38
 We agree with Williams that Walker-Thomas required the district court not only to have examined, as it did in the first part of its analysis, whether he could have pursued other options, but also to have inquired whether he gave meaningful "consent" to the loan. Id. From the second part of its analysis, especially its statement that "he knew what he was doing and did it voluntarily," Williams II, 974 F. Supp. at 19, we cannot be sure whether the district court considered, as Walker-Thomas requires, Williams's lack of education, his ability to understand the transaction, his overall bargaining power, and the fairness of First Government's sales practices. Nor can we be sure whether the district court's observation that "Williams had substantial experience in finding mortgage loans," id., was shorthand for a finding, again as required by Walker-Thomas, that Williams understood the terms of his loan with First Government, notwithstanding the appreciable evidence of his limited literacy, see supra at 744-45.
 
 
 39
 We thus remand the "meaningful choice" issue to the district court. If the district court did in fact consider Williams's lack of education and limited literacy in concluding that Williams "knew what he was doing and did it voluntarily," Williams II, 974 F. Supp. at 19, that will be the end of the matter. Otherwise, the district court should take such action as it believes necessary consistent with this opinion.
 
 Truth in Lending Act
 
 40
 Challenging the district court's denial of his TILA claims, Williams first argues that the district court wrongly rejected his claim that First Government unlawfully failed to disclose the $1,273 life insurance premium as a finance charge associated with the loan. See 15 U.S.C. § 1605 (1994) (requiring all costs of credit to be disclosed to borrowers as finance charges); 12 C.F.R. § 226.4 (1998) (same). The life insurance policy he bought had the following provision, known as an "actively at work requirement":
 
 
 41
 Your insurance will take effect on the date shown above. You must be regularly performing the duties of your occupation on your last scheduled workday before this date. If you are not, your insurance will take effect on the date you resume such duties.
 
 
 42
 According to Williams, First Government knew that the policy would never take effect because it was aware that he had not "regularly perform[ed] the duties of [his] occupation" since retiring in 1987 and that he could never "resume such duties" due to his disability. Thus, Williams argues, the insurance premium amounted to a hidden cost of credit that First Government should have disclosed as a finance charge.
 
 
 43
 Although the language of the "actively at work requirement" could be read to prevent Williams's policy from taking effect, we think ordinary principles of waiver and estoppel would have barredany attempt by the insurance company to deny coverage on this ground. Where an insurer accepts premium payments from the insured with knowledge of facts that would invalidate the policy, the insurer may not avoid liability on the basis of those facts. See Britamco Underwriters, Inc. v. Nishi, Papagjika & Assocs., Inc., 20 F. Supp. 2d 73, 77 (D.D.C. 1998) (noting common law norm that waiver and estoppel "bar[ ] an insurer who has knowledge of facts that would exclude coverage, from seeking to avoid liability on non-coverage grounds after acting as though the policy were in force"); Diamond Serv. Co. v. Utica Mutual Ins. Co., 476 A.2d 648, 654 (D.C. 1984) ("Waiver is an act or course of conduct by the insurer which reasonably leads the insured to believe that the breach will not be enforced. Estoppel ... generally results when an insurance company assumes the defense of an action or claim, with knowledge of a defense of non-liability under the policy...."); see also 16C John A. Appleman & Jean Appleman, Insurance Law & Practice § 9273 (1981). Here, Williams wrote on his insurance application that he was a "Painter--Retired" and that he was not "actively engaged full time in the duties of [his] profession."Knowing this, the insurance company (through First Government) accepted Williams's $1,273 premium. Since these facts would have barred the insurance company from invoking the "actively at work requirement" to deny Williams coverage, we agree with the district court that the insurance policy was not worthless and that the premium was therefore not a finance charge. See Williams II, 974 F. Supp. at 20 n.3.
 
 
 44
 Claiming that the life insurance policy he bought was "credit life" (a policy that insures payment of the outstanding balance on a loan if the borrower dies during the policy's term), Williams next argues that First Government excluded the premium from the finance charge without making disclosures required by TILA. See 12 C.F.R. § 226.4(d)(1)(ii).The district court rejected this argument on the ground that the insurance policy was not credit life. See Williams II, 974 F. Supp. at 20. Again, we agree.
 
 
 45
 The essential feature of a credit life insurance policy is that the beneficiary must be the creditor or the credit account of the insured. See 12 C.F.R. § 226(d), Supp. I, cmt. 6 (official staff interpretations). Williams never designated a beneficiary on his insurance application, nor did he make a subsequent endorsement. He did sign a disclosure form that said: "The [insurance] [c]ompany will pay all insurance benefits to the Bank which will apply it to the unpaid balance of your Loan. The excess, if any, will be paid to your designated Beneficiary." But the quoted language appears on the form under the title "Multiple Life Coverage" and applies only to policies covering two or more co-borrowers. The form contains no such language under the title "Single Life Coverage." We thus agree with the district court that "[h]ad Williams died during the two-year term of the policy, his estate--not First Government or its assignees--would have been entitled to the proceeds of the life insurance policy." Id.
 
 
 46
 In the alternative, Williams argues that even if the policy was not credit life, the evidence compelled the district court to find that Williams did not buy the policy voluntarily and that First Government therefore should have disclosed the premium as a finance charge. See 12 C.F.R. § 226.4(d), Supp. I, cmt. 6 (exempting insurance premiums from disclosures applicable to finance charges "[i]f such insurance is not required by the creditor as an incident to or a condition of credit"). When Williams bought the policy, however, he signed a form titled "OPTIONAL LIFE INSURANCE DISCLOSURE STATEMENT," whose first sentence reads:"Credit related life insurance is not required to obtain credit and will not be provided unless you sign and agree to pay the additional cost." We thus agree with the district court:"[N]o reasonable juror could have concluded that [Williams's purchase] was involuntary." Williams II, 974 F. Supp. at 20.
 
 
 47
 Finally, Williams argues that the district court wrongly denied his claim that First Government failed to provide him timely notice of his right to cancel the loan. Under TILA, a borrower who uses his home as security for a loan is entitled to a three-day "cooling off" period after settlement during which he has an absolute right to cancel the transaction. See 15 U.S.C. § 1635; 12 C.F.R. § 226.23(a)(3). If a lender fails to notify the borrower of the right to cancel three business days before the "cooling off" period expires, then the borrower retains the right to cancel for three years after settlement.See id.
 
 
 48
 First Government issued Williams a notice stating that he had until January 18, 1995 to cancel the loan. Counting backward three days from January 18, the district court assumed that if the notice reached Williams by January 15, then First Government had satisfied its disclosure and delivery obligations. See Williams II, 974 F. Supp. at 21. But "for purposes of rescission," TILA regulations define "business days" as "calendar days except Sundays and the legal public holidays ... such as ... the Birthday of Martin Luther King, Jr." 12 C.F.R. § 226.2(a)(6). January 16 was the King holiday. January 15 was a Sunday. The January 18 expiration date thus meant that First Government had to deliver notice of Williams's right to cancel no later than January 13, the date of the loan settlement.
 
 
 49
 Notwithstanding this miscalculation of the notice delivery date, we think the district court properly dismissed Williams's claim. At the loan settlement on January 13, Williams signed a document stating, "I acknowledge receipt of two copies of NOTICE OF RIGHT TO CANCEL...." His signature created a rebuttable presumption of delivery. See 15 U.S.C. § 1635(c). To rebut this presumption, Williams relied on his trial testimony stating that he received no papers to take home at settlement and that he only received loan documents in the mail some days later. See Tr. at 142-44. Rejecting this argument, the district court concluded that "it is reasonable ... to require strict proof of a claim of non-delivery" and that "Williams' testimony, on its own, is not sufficient."Williams II, 974 F. Supp. at 22.
 
 
 50
 Although we disagree with the district court on the proper legal standard for evaluating the sufficiency of Williams's testimony--the presumption of delivery imposed on Williams "the burden of going forward with evidence to rebut or meet the presumption, but [did] not shift to [him] the burden of proof," Fed. R. Evid. 301; see Legille v. Dann, 544 F.2d 1, 6 (D.C. Cir. 1976)--we agree with the court's ultimate conclusion. Even under Rule 301's more permissive standard, Williams failed to satisfy his evidentiary burden. After Williams testified that he received no papers during the loan settlement, First Government's lawyer confronted him with his deposition in which he had stated that he "look[ed] at those papers when [he] got home" on "the day of the settlement." Tr. at 143. Pointing to Williams's prior inconsistent statement, the district court found his trial testimony not credible, see Williams II, 974 F. Supp. at 21-22, observing that "Williams failed to call the only other witness to the actual closing, a friend who accompanied him and who might have provided corroboration that the documents were not handed to him," id. at 22 n.10. Because "the district court's credibility determinations are entitled to the greatest deference from this court on appeal," Carter v. Bennett, 840 F.2d 63, 67 (D.C. Cir. 1988), and because Williams offered no evidence of non-delivery beyond his trial testimony, we affirm the district court's determination that Williams failed to rebut the presumption of delivery.
 
 
 51
 Having affirmed the district court's dismissal of Williams's TILA claims, we have no need to reach Industry Mortgage's arguments denying assignee liability under 15 U.S.C. § 1641.
 
 IV
 
 52
 We remand Williams's common law unconscionability claim for further proceedings consistent with this opinion. On all other claims, we affirm.
 
 
 53
 So ordered.
 
 
 
 Note:
 
 
 *
 Former Circuit Judge Wald was a member of the panel at the time of oral argument, but did not participate in the decision.