*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 18-CV-945 and 19-CV-155

NITA B. ARCHIE, APPELLANT,

V.

U.S. BANK, N.A., AS TRUSTEE FOR THE RMAC TRUST,
SERIES 2016-CTT, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CAR-8322-14)

(Hon. William Jackson, Trial Judge)

(Argued June 9, 2020 Decided August 5, 2021)

*Jason M. Knott*[*], with whom *Steven N. Herman*, was on the brief, for appellant.

*Jordan M. Smith* for appellee.

Before THOMPSON, BECKWITH, and MCLEESE, *Associate Judges*.

THOMPSON, *Associate Judge*: This appeal arises from a "Complaint for Judicial Foreclosure Sale" filed by PennyMac Holdings, LLC ("PennyMac"), the predecessor in interest to appellee U.S. Bank, N.A. ("U.S. Bank") against defendant/appellant Nita B. Archie. By its complaint, PennyMac sought to

---

[*] Mr. Knott withdrew from the case after oral argument.

foreclose on the property located at 1467 Chapin Street, N.W. (the "Property"), based on appellant Archie's default on her mortgage payments. In her answer, Ms. Archie raised a number of affirmative defenses, recoupment defenses, and counterclaims. In an August 17, 2018, bench ruling, the Superior Court granted final summary judgment in favor of PennyMac (and later substituted U.S. Bank as the prevailing party) and rejected Ms. Archie's defenses and counterclaims. Ms. Archie seeks relief on several grounds. We affirm the Superior Court's determination that the foreclosure complaint was not time-barred and its ruling that Ms. Archie was not entitled to judgment on the pleadings. However, we agree with Ms. Archie that summary judgment in favor of PennyMac on its foreclosure complaint and against Ms. Archie on her lack-of-standing and other defenses and counterclaims was not warranted. We therefore reverse the entry of summary judgment in favor of PennyMac and remand for further proceedings.

## I. Background

The record indicates that in 1995 or 1996, Ms. Archie's parents deeded her the Property, which thereafter was free and clear of any mortgage indebtedness until 2005. Ms. Archie alleges that beginning in 2005, she fell prey to a series of "fraudulently-induced mortgage transactions" that were "equity-stripping refinance

scheme[s][.]" Ms. Archie took out a $231,000 loan on the Property in 2005 and a $318,500 refinance loan in 2006. She claims to have believed that through the refinancing transactions in issue here, she was availing herself of a program that would help make whole homeowners like her who had been scammed by other lenders. The reality, however, is that, in 2007, she signed loan and closing documents by which she took out an adjustable-rate $436,000 refinance loan even though she had no income at the time. As to the 2007 loan, Ms. Archie executed a promissory note payable to Premier Mortgage Capital, Inc. ("Premier"). Premier sold the loan to CitiMortgage, Inc. ("Citi") immediately after the loan transaction was completed. Subsequently, PennyMac bought the (then-distressed) loan from Citi in 2011, and U.S. Bank eventually succeeded PennyMac as the loan purchaser.

There is no dispute that Ms. Archie defaulted on the Premier promissory note (the "Note") and accompanying deed of trust (the "Deed of Trust") in 2008, after she failed to make the monthly payment due on May 1, 2008. She has since made no payments on the loan. The default not having been cured, and Citi not having followed through on a notice of default and intent to accelerate that it issued in August 2008, PennyMac filed its complaint for judicial foreclosure on December 31, 2014. In her second amended answer, Ms. Archie raised a number of affirmative and recoupment defenses and counterclaims.

Ms. Archie moved for judgment on the pleadings on the ground that PennyMac lacked standing to seek foreclosure. The Superior Court denied that motion in a ruling from the bench on August 4, 2017. In a subsequent written order, the Superior Court ruled that PennyMac's foreclosure complaint was barred under the six-year statute of limitations for enforcing a note specified in the District of Columbia's version of the Uniform Commercial Code ("UCC"). *See* D.C. Code § 28:3-118(a) (2013 Repl.). But, after an August 17, 2018, hearing on PennyMac's motion for reconsideration or to alter or amend the judgment, the court reversed its ruling and determined that a twelve-year limitations period applied and that the complaint therefore was not time-barred. The Superior Court also rejected Ms. Archie's defenses and counterclaims. Accordingly, the court entered final summary judgment in favor of PennyMac. This appeal followed.

## II. Asserted Grounds for Dismissal

We begin our analysis with Ms. Archie's arguments as to why dismissal in her favor was warranted.

### A. Judgment on the Pleadings

We turn first to Ms. Archie's challenge to the Superior Court's denial of her Super. Ct. Civ. R. 12(c) motion for judgment on the pleadings. Our review is de novo. *See Grimes v. District of Columbia*, 89 A.3d 107, 111–12 (D.C. 2014).

Ms. Archie's Rule 12(c) motion sought dismissal of the complaint for lack of standing to foreclose. The premise of the motion was that while PennyMac alleged that it was the holder of the Note and beneficiary of the Deed of Trust executed by Ms. Archie, the paperwork it attached to its complaint (showing an endorsement of the Note in blank by Citi) did not show a prior endorsement by Premier that gave Citi the right to negotiate the Note by transferring it to PennyMac. The Superior Court did not err in denying the motion. As the Superior Court correctly recognized, all that is required to survive a Rule 12(c) motion is that the complaint "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. at 112 (quoting *Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011)). That requirement was met by PennyMac's allegations that it was the "current holder of the Note and the beneficiary of the Deed of Trust[,]" that Ms. Archie defaulted on the Note and failed to cure the default, and that PennyMac "is entitled to enforce the Deed of Trust through a judicial foreclosure sale of the Property." *Cf. Jaffer v. Chase*

*Home Fin., LLC*, 155 So. 3d 1199, 1201–02 (Fla. Dist. Ct. App. 2015) (holding, in case in which copy of the note attached to the complaint "did not contain any indorsements or allonges demonstrating the note had been transferred to Chase," that "for exhibits to serve as a basis for dismissing a complaint . . . the exhibits must actually negate the cause of action — not simply raise possible defenses to it") (quoting *Paladin Props. v. Family Inv. Enters.,* 952 So. 2d 560, 564 (Fla. Dist. Ct. App. 2007)).

### B. The Statute of Limitations

Ms. Archie contends in the alternative that she was entitled to dismissal of the complaint because PennyMac's December 2014 complaint for foreclosure, filed more than six years after she defaulted on the Note in May 2008 and Citi issued its August 29, 2008, notice of default and intent to accelerate, was time-barred under D.C. Code § 28:3-118(a).  Section 28:3-118(a) provides generally that "an action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within 6 years after the due date or dates stated in the note, or, if a due date is accelerated, within 6 years after the accelerated due date."

The Superior Court relied instead on D.C. Code § 12-301(6) (2012 Repl. & 2020 Supp.), which provides that "[e]xcept as otherwise specifically provided by law, actions [on any . . . instrument under seal] may not be brought after the expiration of [12 years] from the time the right to maintain the action accrues[.]" On both the Note and the Deed of Trust, the word "seal" appears next to Ms. Archie's signature. We have explained that "[w]hen the instrument is made by an individual, the word 'seal' next to the signature is 'standing alone, sufficient to create a sealed instrument entitled to the twelve-year statute of limitations.'" *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 318 (D.C. 2008) (quoting *Burgess v. Square 3324 Hampshire Gardens Apts.*, 691 A.2d 1153, 1156–57 (D.C. 1997)). Our jurisdiction long ago recognized that "a deed of trust is a sealed instrument and the period of limitation is twelve years." *Brice v. Walker*, 121 F.2d 864, 865 (D.C. Cir. 1941).

Appellant contends that § 28:3-118(a) should control despite the express applicability of § 12-301(6) to instruments under seal because, she asserts, § 28:3-118(a) is the more specific statute as to notes and is the more recently enacted statute. However, while § 28:3-118(a) is specific as to notes, § 12-301(6) is equally specific regarding instruments under seal. "It can be difficult to determine which of two statutes is more general and which is more specific[,]" including

where "each of the provisions at issue is more specific than the other in some respects and more general than the other in some respects." *J.P. v. District of Columbia*, 189 A.3d 212, 220 (D.C. 2018). As another court has aptly observed, "[i]n such a case, the canon of construction that a specific statute governs a general one does not assist us in interpreting the statutes." *In re Cesar G.*, 682 N.W.2d 1, 40 (Wisc. 2004). In any event, by its terms, § 28:3-118(a) is its most specific with regard to the limitations period for enforcing "the obligation of a party to pay a note[.]" Here, PennyMac's complaint was not the initiation of an action to require Ms. Archie to pay the Note, but instead was, as the Superior Court correctly recognized, the initiation of an in rem action in equity to enforce the Deed of Trust, by requiring a sale of the Property to generate proceeds to repay the lender for funds advanced on the security of the Property. *See Bank of N.Y. Mellon Tr. Co. N.A. v. Henderson*, 862 F.3d 29, 32–33 (D.C. Cir. 2017) ("D.C. law allows the holder of a note to enforce the deed of trust by judicial foreclosure") (citing *Szego v. Anyanwutaku*, 651 A.2d 315, 316 (D.C. 1994) (quoting the general rule that "a creditor whose debt is secured by mortgage may pursue his remedy in personam for the debt [evidenced by a note], or his remedy in rem to subject the mortgaged property to its payment")).

Further, our court has rejected the view that a note and deed of trust, "being parts of the same transaction, are to be considered as one instrument" subject to the same limitations period. *Huntley v. Bortolussi*, 667 A.2d 1362, 1365 (D.C. 1995) (quoting *Brice*, 121 F.2d at 865).[1] In addition, our jurisdiction has recognized that the holder of a secured note may resort to the security after the time for enforcing the personal obligation of a note has passed (though may not sue for any deficiency). *See Brice*, 121 F.2d at 865 (rejecting contention that note and deed of trust were subject to the same limitations period).[2] We conclude that PennyMac's foreclosure action was not subject to or barred by the six-year limitations period

---

[1] *Cf. Yasuna v. Miller*, 399 A.2d 68, 72 (D.C. 1979) ("[T]he note and the trust deed can be considered merely different parts of a single contract[,]" but "[t]he remedy of the holder-mortgagee . . . may depend on which route he pursues to collect his debt.").

[2] The *Brice* court cited *Bank of Wildwood v. Kerl*, 189 So. 866, 868 (Fla. 1939) ("[T]he fact that the remedy at law is barred by the statute of limitations upon the promissory notes secured by a mortgage under seal does not affect the lien of the mortgage . . . [S]uch lien is only affected by the longer term which by the statute is applied to sealed instruments."); *McKenzie v. Matthews*, 44 So. 958, 959 (Ala. 1907) ("[W]hatever may be the rights or the remedy of the mortgagee in respect to the lien on the property mortgaged, his right to . . . enforce the debt [is] cut off by the statute of six years[.]"); and *Slingerland v. Sherer*, 49 N.W. 237, 237–38 (Minn. 1891) ("[A] variety of cases may exist where the right to enforce the mortgage still exists, but the right to recover a personal judgment for the debt has been lost [e.g., because personal liability has been terminated by the statute of limitation], and consequently where the only judgment that could be rendered would be one of foreclosure."). *See* 121 F.2d at 865 n.1.

established by § 28:3-118(a), and that the Superior Court did not err in denying Ms. Archie's motion for judgment on the pleadings.[3]

### III.    Defenses and Counterclaims

We now turn to Ms. Archie's arguments as to why the Superior Court erred in granting summary judgment in favor of PennyMac. Our review of the trial court's order granting summary judgment is de novo. *Zere v. District of Columbia*, 209 A.3d 94, 98 (D.C. 2019) (citing *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1033 (D.C. 2015)). "In determining whether summary judgment was appropriate, we view the evidence in the light most favorable to the non-prevailing party and we draw all reasonable inferences in that party's favor." *Liu v. U.S. Bank Nat'l Ass'n*, 179 A.3d 871, 876 (D.C. 2018) (citing *Woodland v. Dist. Council 20*, 777 A.2d 795, 798 (D.C. 2001)). Summary judgment is appropriate

---

[3] Given our resolution of this issue, we need not address U.S. Bank's argument that "[a]ny acceleration of the loan caused by [Citi's] August 2008 notice was revoked" and that the foreclosure cause of action did not accrue until PennyMac accelerated the loan in 2014.

Citing *Davis v. Stone*, 236 F. Supp. 553, 557 (D.D.C. 1964), U.S. Bank argues that the applicable limitations period is fifteen years, as prescribed by D.C. Code § 12-301(1) (establishing a fifteen-year limitation period for "the recovery of lands, tenements, or hereditaments"). We need not address this argument either because there is no dispute that PennyMac timely commenced its action even if the applicable limitations period is the shorter, twelve-year period referenced in § 12-301(6).

only "where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Chase Plaza Condo. Ass'n v. JP Morgan Chase Bank, N.A.*, 98 A.3d 166, 172 (D.C. 2014)).

### A. Standing

Ms. Archie contends that the summary judgment record raised material issues of fact regarding PennyMac's standing to foreclose. She cites the multiple versions of allonges in the summary judgment record, which create an issue about whether PennyMac was in possession of an instrument whose true chain of endorsements gave PennyMac the necessary standing. The record also shows that PennyMac's affiants had no personal knowledge regarding the affixation of the Premier endorsement to the original Note, and that PennyMac's Super. Ct. Civ. R. 30(b)(6) deposition witness did not know whether the allonge bearing an endorsement from Premier to Citi was at one time attached to the Note.[4] While the deponent's lack of knowledge about those matters perhaps is not unusual and may not raise any red flag, the deponent also could not explain why PennyMac's

---

[4] *See* D.C. Code § 28:3-204(a) (providing that "[f]or the purpose of determining whether a signature is made on an instrument [so as to negotiate the instrument to a transferee who becomes the holder, *see* D.C. Code § 28:3-201(a)], a paper affixed to the instrument is a part of the instrument").

collateral file contained different versions of an endorsement in blank by Citi (one bearing the stamp "Endorsement canceled"). We agree with Ms. Archie that, taken together, these unexplained matters create material factual issues about the chain of title of the Note, and about whether it gave PennyMac the right to foreclose, that precluded summary judgment in favor of PennyMac on the standing issue. *Cf. Logan v. Lasalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1025 (D.C. 2013) (concluding that further factual development and legal analysis were necessary where "the note and deed of trust list only Paine Webber and the original trustees, while the notice of foreclosure lists a different holder and different trustees").

PennyMac's Rule 30(b)(6) witness also acknowledged that, at the time of her deposition, the (purported) allonges accompanying the Note were paper clipped to the Note. We do not agree with Ms. Archie's argument that (the possible) use of a paper clip (at some earlier time) to attach the allonge to the Note was ineffective to render it part of the instrument. *See, e.g.*, *Galvin v. EMC Mortg. Corp.*, Civ. No. 12-cv-320-JL, 2014 U.S. Dist. LEXIS 146582, *24 (D.N.H. Oct. 3, 2014) (agreeing that "attachment of an allonge to an instrument by means of a paper clip is sufficient to satisfy [the] . . . requirement that the allonge be affixed to the instrument") (internal quotation marks omitted) (citing 6 William D. Hawkland et al., HAWKLAND'S UNIFORM COMMERCIAL CODE SERIES § 3-204:3 (2012), for the

point that because "[s]ection 3-204(a) omitted old Article 3's requirement that the allonge be firmly affixed[,] . . . a paper clipped or stapled to an instrument is sufficient as an allonge"); *Purificato v. Nationstar Mortg., LLC*, 182 So. 3d 821, 823 (Fla. Dist. Ct. App. 2016) (collecting cases, and explaining that the critical factor is evidence of intent that the allonge be part of the promissory note, not the manner of affixation). However, to the extent that there are genuine factual issues about whether the Premier and Citi signatories intended the allonges to be part of the Note, that, too, is a reason why summary judgment in favor of PennyMac on the issue of standing was not appropriate.[5]

**B. Other Affirmative Defenses, Recoupment Defenses, and Counterclaims**

---

[5] We are unpersuaded by Ms. Archie's argument that the fact that there was room for indorsements on the Note itself made the use of allonges ineffective. Ms. Archie relies on *Big Builders, Inc. v. Israel*, 709 A.2d 74, 77 (D.C. 1998), for the proposition that where there is space on a note for an indorsement, an allonge cannot be used for an indorsement. *Big Builders* does so state, but the statement is dictum; it was unnecessary to the result in that case because the "primary obstacle" to the plaintiff's enforcement of the note was that the indorsement was on a paper that concededly "was never physically affixed to the note." *Id.* at 76. Moreover, *Big Builders* did not acknowledge the official comment to UCC 3-204(a) (D.C. Code § 28:3-204(a)), which states that "[a]n indorsement on an allonge is valid even though there is sufficient space on the instrument for an indorsement." UCC § 3-204 cmt. 1.

The viability of Ms. Archie's defenses depends in a part on whether PennyMac, as a (putative) successor in interest to Premier (the entity that allegedly engaged in predatory and fraudulent refinancing in the transaction evinced by the Note and Deed of Trust), is subject to the defenses that would have applied against Premier. Our analysis starts with the undisputed fact that PennyMac "received an assignment of the mortgage note while it was in default from Citibank" and thus was not a holder in due course. *See* D.C. Code § 28:3-302(a)(2)(iii) (providing that a "holder in due course" must have taken the instrument "without notice that the instrument is overdue"). Thus, if PennyMac were attempting to enforce the Note, under D.C. Code § 28:3-305(a) (2012 Repl. & 2020 Supp.), its claim would be "subject to . . . (1) [a] defense of the obligor based on . . . (ii) . . . illegality of the transaction which, under other law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms"; "(2) [a] defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract" and "(3) [a] claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument[.]" D.C. Code § 28:3-305(a)(1)-(3).

As discussed above, however, PennyMac does not seek to enforce the Note (or any other negotiable instrument); rather, its foreclosure action seeks to enforce the Deed of Trust, which is not a "negotiable instrument" governed by Article 3 of the Uniform Commercial Code. *See* D.C. Code § 28:3-102(a) (applicability of Article 3 to negotiable instruments) and § 28:3-104(a) (definition of "negotiable instrument"). Nevertheless, asserting that it "is not claiming to be a holder in due course," PennyMac has acknowledged that "origination-based fraud claims may be asserted in defense to this foreclosure." That acknowledgment is consistent with the law in this jurisdiction, which is that "the rights under the Deed of Trust follow the Note." *Chase Plaza Condo. Ass'n,* 98 A.3d at 170 n.2 (quoting *Grant II v. BAC Home Loans Servicing*, No. 10-CV-01543 (RLW), 2011 U.S. Dist. LEXIS 113443, at *11 (D.D.C. Sept. 30, 2011)); *cf. In re Kennedy Mortg. Co.*, 17 B.R. 957, 965 (Bankr. D.N.J. 1982) (citing 54A Am. Jur. 2d Mortgages § 133 (1982) for the rule that "where the obligation secured fails, the mortgage is likewise commonly considered to be a nullity, and a mortgage or deed of trust in the nature of a mortgage given to secure an obligation void by positive prohibition of laws is of no force"); *Coon v. Shry*, 289 P. 815, 816 (Cal. 1930) ("[S]ince the note, evidencing the debt, is void . . . the mortgage must fall with the note, and must be declared to be void."); *Great Falls Bank v. Pardo*, 622 A.2d 1353, 1357 (N.J. Super. 1993) ("[W]hen the underlying obligation fails, the mortgage becomes a

nullity.").[6] In short, although PennyMac (and now U.S. Bank) seeks to enforce the Deed of Trust, its claim is subject to the defenses (such as fraud, unconscionability, and/or illegality of the transaction under a law other than the UCC that nullifies the obligation of the obligor) and claims in recoupment that would be applicable to the Note, as listed in D.C. Code § 28:3-305(a)(1)-(3).

We address each of Ms. Archie's defenses and counterclaims in turn.

### 1. Unconscionability

Ms. Archie's amended answer pled unconscionability as an affirmative defense. The governing common law is that "where the element of unconscionability is present at the time a contract is made, the contract should not be enforced." *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.

---

[6] By contrast, and as recognized by *Brice*, 121 F.2d at 865, a deed of trust may remain enforceable even though enforcement of the underlying note is time-barred. *Cf. In re Nat'l Tile & Terrazzo Co.*, 537 F.2d 329, 331 (9th Cir. 1976) ("There are California decisions [such as *Coon*, cited *supra*] that contain language to the effect that a lien cannot be effective if the underlying debt is invalid. . . . [However, those decisions] involved underlying debts that were invalid from their inception. . . . [e.g.,] fraudulently induced. . . . [By contrast,] [w]hen an initially valid debt not discharged by the creditor has become unenforceable because of the statute of limitations . . . the lien does not lose all of its vitality.").

Cir. 1965). An agreement "may be unconscionable either because of the manner in which it was made or because of [its] substantive terms[,]" *Urban Invs., Inc. v. Branham*, 464 A.2d 93, 99 (D.C. 1983) (quoting *Bennett v. Fun & Fitness, Inc.*, 434 A.2d 476, 480 (D.C. 1981)) (internal quotation marks omitted), or "because of a combination of both." *Id*. Generally, a party seeking to avoid an agreement on the basis of unconscionability must prove both "an absence of meaningful choice on the part of one of the parties" (procedural unconscionability) and "contract terms which are unreasonably favorable to the other party" (substantive unconscionability). *Williams v. Walker-Thomas Furniture*, 350 F.2d at 449. But "in an egregious situation, one or the other may suffice." *Bennett,* 434 A.2d at 480 n.4. In addition, "a finding of liability under [section 28-3904(r) of the CPPA [Consumer Protection Procedures Act] for "mak[ing] or enforc[ing] unconscionable terms or provisions" of a sale of credit] would be highly probative of common law unconscionability." *Williams v. First Gov't Mortg. & Inv'rs Corp.,* 225 F.3d 738, 748 (D.C. Cir. 2000) (citing D.C. Code §§ 28-3904(r)(1) & (5), which require consideration of "knowledge by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer" and the person's having "knowingly taken advantage of the inability of the consumer reasonably to protect [her] interests by

reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors").

In rejecting Ms. Archie's unconscionability affirmative defense, the Superior Court cited evidence that Ms. Archie had taken out other refinancing loans;[7] benefitted from the loans, including the Premier loan, by receiving cash distributions; and admittedly failed to read the loan documents. Although the court recognized Ms. Archie's contentions that Premier falsified the loan application, including by misrepresenting her income in order to qualify her for the loan, and made the loan while knowing that she had no ability to repay it, the court found that these allegations did not go to the "essence of unconscionability" by showing an absence of "meaningful choice" on Ms. Archie's part. In so concluding, the court failed to consider that, to determine whether a party seeking to void a contract lacked a meaningful choice, the court must look to "all the circumstances surrounding the transaction," including, for example, "the manner in which the contract was entered into[.]" *Associated Ests. LLC v. Bankatlantic*, 164 A.3d 932, 943 (D.C. 2017) (quoting *Williams v. Walker-Thomas Furniture*, 350 F.2d at 450–51) (internal quotation marks omitted). Relevant circumstances include the

---

[7] These were loans from a lender, To God Be The Glory, that Ms. Archie alleged scammed her in much the same way that Premier allegedly did.

presence of "high pressure commercial tactics," the provision of "misleading information about the loan agreement[,]" taking "advantage of the [debtor's] fear of losing her home as well as her lack of understanding of the agreement and its terms," and "an imbalance in the understanding and acumen of the parties." *Williams v. Aries Fin., LLC*, No. 09-CV-1816, 2009 U.S. Dist. LEXIS 107812, at *31 (E.D.N.Y. Nov. 18, 2009) (quoting *M&T Mortg. Corp. v. Miller*, 323 F. Supp. 2d 405, 413 (E.D.N.Y. 2004)) (internal quotation marks omitted); *see also Williams v. First Gov't Mortg.*, 225 F.3d at 749 (remanding common-law unconscionability claim because district court may have failed to take into account, *inter alia*, "the fairness of First Government's sales practices" in considering whether the borrower had a meaningful choice).  The court also did not consider whether the Premier loan could reasonably be found to be substantively unconscionable, i.e., "unreasonably favorable to [Premier]" — which immediately offloaded any risk by selling the loan to Citi — because it "knew [Ms. Archie] could not afford the terms of the agreement."  *Williams v. Aries Fin*., 2009 U.S. Dist. LEXIS 107812 at *32.[8]

---

[8] *See also* D.C. Code § 28-3904(r)(1) (CPPA provision instructing that, in determining whether terms of a credit agreement are unconscionable, courts are to consider "knowledge by the person at the time the credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer"; *Williams v. First Gov't Mortg.*, 225 F.3d at 742 (affirming jury verdict on CPPA violation based on evidence that lender made Williams a loan knowing

(continued…)

U.S. Bank argues that Ms. Archie cannot prove unconscionability because she derived "substantial benefit" from the Premier loan (both a $100,000 cash payout and relief from a prior lien). But that does not necessarily foreclose an unconscionability defense. *Cf. Hughes v. Abell*, 867 F. Supp. 2d 76, 86–87 (D.D.C. 2012) (reasoning, in a CPPA case, that while "it would not be possible for a finder-of-fact to reasonably conclude . . . that Hughes did not receive a substantial benefit from the loan[,]" the factors the trial court was to consider in determining whether the loan was unconscionable did not foreclose remedial relief). In sum, the Superior Court erred in summarily rejecting Ms. Archie's unconscionability defense.

### 2. Fraud

---

(…continued)
that he was disabled, had a limited and fixed income, and had no reasonable probability of being able to repay); *Hughes v. Abell*, 867 F. Supp. 2d 76, 86 (D.D.C. 2012) (allowing CPPA claim against Wells Fargo to go to a jury on evidence that "Wells Fargo knew [when it originated the loan at issue] that there was no reasonable probability of payment on the loan"); *Carroll v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41, 51–52 (D.D.C. 2009) (finding that plaintiff successfully alleged CPPA claim by alleging that lender "knew, either actually or through its agents, that there was no reasonable probability that the Carrolls could pay their obligation to Fremont because the income of the Carrolls and value of their home were knowingly falsified on the application").

The Superior Court found that Ms. Archie's (affirmative and recoupment) fraud defenses (fraud in the inducement and fraud in the factum) failed.[9] The court reasoned that although Ms. Archie claimed that Premier employees misled her about the nature of the transaction (a mortgage loan) and prepared loan documents misstating her income and employment status, she failed to read the loan documents provided to her and signed papers while knowing that the income information listed within them was false, and thus could not reasonably have relied to her detriment on Premier's misrepresentations.[10] U.S. Bank emphasizes the

---

[9] Ms. Archie's amended answer refers to her fraud allegations as establishing "[r]ecoupment [d]efense[s]," while the UCC refers to "claim[s] in recoupment." D.C. Code § 28:3-305(a)(3). Courts have used the terms interchangeably. *See, e.g., Reinwald O'Connor & Playdon v. Snyder*, No. 23380, 2001 Haw. App. LEXIS 83, *21 (Haw. Ct. App. 2001) (using the term "recoupment defense" in referring to the Hawaii counterpart to § 28:3-305(a)(3)); *Metric Partners Growth Suite Inv'rs, L.P. v. Nashville Lodging Co.*, 989 S.W.2d 700, 702 (Tenn. Ct. App. 1998) (using the term "recoupment defense" in referring to the Tennessee counterpart to § 28:3-305(a)(3)).

[10] In order to prevail on a fraud claim, a claimant must allege with particularity and prove "(1) a false representation, (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992) (citing *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977)). "Fraud in the factum is the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents." *Moore v. Deutsche Bank Nat'l Tr. Co.*, 124 A.3d 605, 609 (D.C. 2015) (quoting *Chen v. Bell-Smith*, 768 F. Supp. 2d 121, 135 (D.D.C. 2011)) (internal quotation marks omitted).

foregoing points and adds that Ms. Archie "ratified" the loan by accepting a cash payout and making loan payments.

As we understand the record, however, Ms. Archie's fraud-in-the-inducement defenses rest in part on her sworn statements that the Premier employees told her that they were going to give her a high-paying job that would enable her to make the loan payments (but after the loan closed, the Premier people "disappeared"). The evidence of Ms. Archie's failure to read the loan documents was not pertinent to that aspect of her fraud-in-the inducement defense.[11] Nor is the evidence of her failure to read the loan documents fatal to her fraud-in-the-factum defenses if she was not a "literate and reasonably intelligent person" when it came to real estate financing documents. *Moore*, 124 A.3d at 609 (quoting *Columbia Fed. Sav. & Loan Ass'n v. Jackson*, 131 A.2d 404, 408 (D.C. 1957)) (internal quotation marks omitted). Ms. Archie's testimony that she "lacked understanding in financial matters" created a triable issue as to whether she was defrauded about the content and significance of the loan documents she signed. As to U.S. Bank's argument that Ms. Archie's fraud defenses must fail because she ratified the loan transaction by not rescinding it within the time

---

[11] The parties have not briefed, and for that reason we do not address, whether Ms. Archie pled her fraud defenses with adequate particularity.

allowed and proceeding to make loan payments, whether a transaction was ratified is a question of fact "to be determined from all the circumstances of the case." *Slater v. Berlin*, 94 A.2d 38, 42 (D.C. 1953). Ms. Archie's explanation that she could not cancel the transaction because Premier closed up shop and disappeared created an issue of fact as to ratification that likewise made summary judgment in favor of PennyMac inappropriate.

### 3. Unclean Hands

"The equitable doctrine of unclean hands only applies where there is misconduct by the plaintiff in the same transaction that is the subject of his claim." *Int'l Tours & Travel, Inc. v. Khalil*, 491 A.2d 1149, 1155 (D.C. 1985) ("Unless the amount owed the plaintiff is the direct result of the unethical behavior . . . the clean hands doctrine does not bar the plaintiff's recovery."). Courts have found that "unclean hands [such as] '[u]nscrupulous practices'" may be asserted as an affirmative defense to a mortgage foreclosure action. *Shahar v. Green Tree Servicing, LLC*, 125 So. 3d 251, 253 (Fla. Dist. Ct. App. 2013) (quoting *Cong. Park Office II, LLC v. First-Citizens Bank & Tr. Co.*, 105 So. 3d 602, 609 (Fla. Dist. Ct. App. 2013)); *cf. Monetary Funding Grp., Inc. v. Pluchino*, 867 A.2d 841, 848 (Conn. App. Ct. 2005) (finding that where the borrower was unsophisticated

and the lender misled the borrower about the terms of the loan and failed to conduct a bona fide evaluation of the borrower's ability to repay the loan, the trial court was correct to conclude that the borrower's unclean hands defense precluded foreclosure).

The Superior Court determined that Ms. Archie's unclean-hands affirmative defense did not apply in this case because Ms. Archie benefited from the Premier loan by receiving a cash payout of close to $100,000 from the Premier refinancing.[12] However, even if we assume that Ms. Archie's effort to avoid foreclosure while having received but not repaid a substantial benefit from the Premier loan means that her hands are not entirely clean with respect to the matter in litigation, the unclean hands doctrine permits a court to consider whether the conduct of the party against whom the defense is asserted is "more unconscionable than that committed by [the party asserting the defense]." *Fed. Ins. Co. v. United States*, 882 F.3d 348, 372 (2d Cir. 2018) (quoting 11A Charles Alan Wright, Arthur R. Miller, *et al., Fed. Prac. & Proc.: Civ.* § 2946 (3d ed. 2017)); *cf. Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co.*, 95 F.2d 978, 983 (6th Cir. 1937) (same); *Saint-Jean v. District of Columbia*, 846 F. Supp.

---

[12] Ms. Archie's counsel acknowledged that she received $98,000 from the Premier refinancing.

2d 247, 258 (D.D.C. 2012) (same). The record shows a genuine issue regarding whether Premier's alleged conduct — inducing Ms. Archie to enter into a refinancing transaction when Premier knew that she had no income for loan repayment and would soon run out of funds from the cash payout to make the required loan payments, thereby putting her ownership of the Property and its equity in jeopardy — was more unconscionable than any questionable conduct by Ms. Archie, such that summary judgment in favor of PennyMac was not appropriate.

U.S. Bank argues that under *Int'l Tours & Travel*, an unclean hands defense cannot lie in this case because "[t]he transaction at the root of Ms. Archie's unclean hands defense is the loan's origination[,]" which "cannot be imputed to PennyMac." U.S. Bank's argument rests on an overly narrow interpretation of *Int'l Tours & Travel.* We think it is enough if the defense "pertain[s] to the very subject matter involved [in the complaint] and affect[s] the equitable relations between the litigants." *In re Digit. Music Antitrust Litig.*, 321 F.R.D. 64, 73, 96, 98 (S.D.N.Y. 2017) (declining to exclude the unclean hands defense asserted by the digital-music price-fixing defendants, who alleged that members of the putative plaintiff class were illegally downloading digital music) (internal quotation marks omitted). Here, the subject matter of PennyMac's complaint was Ms. Archie's

default on payments due under the Note and Deed of Trust, and Ms. Archie's unclean hands defense pertains to that same subject matter, in that its essence is that PennyMac should not be heard to complain of Ms. Archie's payment default when the underlying loan was unconscionable.

### 4. Equity's Abhorrence of Forfeiture

In her answer, Ms. Archie invoked as an affirmative defense the principle that "equity abhors a forfeiture." *See Jones v. Guar. & Indem. Co*., 101 U.S. 622, 628 (1879). The Superior Court reasoned that a foreclosure would not constitute a forfeiture and therefore rejected the (purported) defense.

"Equity abhors a forfeiture" appears to be a request for equitable relief rather than a defense. *See Kesling v. Countrywide Home Loans, Inc*., No. 2:09-588, 2011 U.S. Dist. LEXIS 7542, at *13 (S.D. W.Va. Jan. 24, 2011). In particular, Ms. Archie's brief suggests that even if the facts will not support complete nullification of the Deed of Trust, the balance of equities supports affording her a life tenancy in the Property. Whether Ms. Archie is entitled to such relief depends on whether she succeeds on her other claims. *Id.* That is, the "equity abhors a forfeiture" principle is potentially relevant to the relief Ms. Archie would be entitled to receive if she

could establish other(s) of her claims or defenses, but does not by itself operate as a general defense to foreclosure. We leave the matter for possible further consideration on remand. *See Sovereign Bank, FSB v. Kuelzow*, 687 A.2d 1039, 1044 (N.J. Super. Ct. 1997) (principle that "nature abhors a forfeiture" provides court with equitable authority in determining foreclosure matter).

### 5. *The CPPA Recoupment Defense and Counterclaim*

Appellant next contends that the Superior Court erred by dismissing her CPPA recoupment defense and counterclaim. Ms. Archie asserted her CPPA recoupment claim against PennyMac based on misrepresentations and other conduct by Premier and its agents that she alleges violated the CPPA, specifically, D.C. Code § 28-3904(a), (b), (e), (h), (r)(1), (r)(2), and (r)(5). She relies on D.C. Code § 28:3-305(a)(3), which makes a transferee such as PennyMac subject to "[a] claim in recoupment of the obligor against the original payee of the instrument [here, Premier] if the claim arose from the transaction that gave rise to the instrument[.]" She also relies on D.C. Code § 28-3901(a)(4) (CPPA definitional section indicating that "successors or assigns" of merchants may be CPPA "respondents"). Ms. Archie's CPPA counterclaim alleges that PennyMac itself violated the CPPA by seeking to enforce an unconscionable loan. *See* D.C. Code §

28-3904(r). The Superior Court rejected Ms. Archie's CCPA defense and counterclaim on the ground that PennyMac was not a "merchant."

This court "has repeatedly concluded that the CPPA was designed to police trade practices arising only out of consumer-merchant relationships." *Ali v. Tolbert*, 636 F.3d 622, 628 (D.C. Cir. 2011) (quoting *Snowder v. District of Columbia*, 949 A.2d 590, 599 (D.C. 2008)) (internal quotation marks omitted). In *Howard v. Riggs Nat'l Bank*, 432 A.2d 701 (D.C. 1981), we explained that the class of persons subject to suit for unfair or deceptive trade practices under the CPPA includes only "'merchants' who 'supply the goods or services which are or would be the subject matter of a trade practice.'" *Id.* at 709 (quoting D.C. Code § 28-3901(a)(3) (2013 Repl. & 2020 Supp.). We recognized that limitation on the reach of the CPPA notwithstanding the fact that the Act defines "respondents" — the persons about whom a consumer may bring a CPPA complaint before the Department of Consumer and Regulatory Affairs — to mean "one or more merchants alleged by a complainant to have taken part in or carried out a trade practice, *or the successors or assigns of such merchants, and includes other persons who may be deemed legally responsible for the trade practice*." *Id.* (emphasis added). We explained that "[w]hile a 'merchant' is not limited to the

actual seller of the goods or services complained of, he must be a 'person' connected with the 'supply' side of a consumer transaction." *Id.*

Here, there is no dispute that Premier was in a consumer-merchant relationship with Ms. Archie in that it sold her credit (in the form of a real estate refinancing). *See DeBerry v. First Gov't Mortg. & Inv'rs Corp.*, 743 A.2d 699, 701, 703 (D.C. 1999) (stating that real estate mortgage financing transactions may fall within the reach of the CPPA because they involve sales of consumer credit). The Superior Court reasoned as to PennyMac, however, that while it (assertedly) was a successor or assign of the Note and Deed of Trust, it did not "deal with [Ms. Archie as a] consumer[]" but rather was "in the business of just buying defaulted loans at a discount." The record does indicate that PennyMac bought Ms. Archie's defaulted loan from Citi without extending any additional credit or loaning any money to Ms. Archie. But the notice PennyMac sent to Ms. Archie after acquiring the loan informed her not only that PennyMac would be servicing the loan[13] but

---

[13] The record shows that PennyMac both acquired the loan from Citi and became the loan servicer, a role that may include initiating foreclosure. *See Mohamed v. Select Portfolio Servicing, Inc.*, 215 F. Supp. 3d 85, 89 (D.D.C. 2016). In *Logan*, this court left open the question of "whether the CPPA applies to the trade practices of a mortgage loan servicer[.]" 80 A.3d at 1027. We need not decide here that issue left open in *Logan*, because PennyMac sought foreclosure in its capacity as the holder of the Note and beneficiary of the Deed of Trust.

also possibly could help arrange a loan modification. While there is no evidence in the present record that PennyMac arranged a loan modification, attempted to do so, or was asked to do so, we cannot say at this stage that Ms. Archie will be unable to show that PennyMac functioned as a merchant in its dealings with her such that relief under the CPPA is unavailable. *See* D.C. Code § 28-3901(a)(3) (defining "merchant" to include a person who "does or *would* supply the goods or services which are or would be the subject matter of a trade practice" (emphasis added)); *Ali*, 636 F.3d at 628 (affirming summary judgment in favor of defendant where there was no evidence "even suggesting [that he] . . . held himself out as a person who would supply, any goods or services to Ali" or "offered his services to 'help' her in connection with her ownership or sale of the house"). We therefore vacate the dismissal of Ms. Archie's CPPA recoupment defense and counterclaim and remand for further proceedings.

### 6. The Real Estate Settlement Practices Act

Ms. Archie raised a recoupment defense based on the Real Estate Settlement Practices Act ("RESPA"), relying on Premier's referral relationship with the title company that handled the closing on the Premier loan. *See* 12 U.S.C. § 2607. The Superior Court ruled that the RESPA defense was time-barred. Ms. Archie

acknowledges that she could not have brought an offensive claim under § 2607 because of RESPA's one-year statute of limitations.  *See* 12 U.S.C. § 2614.  We agree with her, however, that "recoupment sought only by way of defense is a right that continues in existence with the primary claim."  *Sears, Roebuck & Co. v. Goudie*, 290 A.2d 826, 830 (D.C. 1972).  Thus, the Superior Court should not have entered summary judgment against Ms. Archie on her RESPA recoupment defense on statute-of-limitations grounds.[14]

### 7. Laches

---

[14] U.S. Bank's brief addresses only whether Ms. Archie's RESPA claim is a defense that could defeat foreclosure, and does not specifically discuss recoupment.  Neither U.S. Bank nor Ms. Archie has briefed whether PennyMac or U.S. Bank, as successor assignees of the Premier loan, could be subject to a RESPA recoupment defense.  Because the issue has not been briefed, we do not address it, except to note that at least one court has ruled that "RESPA imposes no liability on a holder of a note merely by virtue of being a successor to the person or entity who allegedly engaged in a prohibited act under RESPA[,]" and that "the RESPA prohibitions apply only to the actual persons or entities who engage in such activities."  *Good v. Deutsche Bank Nat'l Tr. Co*., 98 So. 3d 1255, 1256 (Fla. Dist. Ct. App. 2012).

Ms. Archie's answer also raised the affirmative defense of laches.[15]  Her brief cites deposition testimony showing that documents pertaining to the underlying loan are no longer available, that some individuals who were participants in the alleged refinancing scam cannot be located, and that memories have faded.  She contends that the Superior Court erred in failing to address her laches defense.

We agree with Ms. Archie that the court erred in not considering her laches defense.  While "[c]ourts will not generally apply the bar of laches on a delay of less duration than the statute of limitations[,]" *In re Hardy*, No. 16-00280, 2018 Bankr. LEXIS 752, at *7 (Bankr. D.D.C. Mar. 12, 2018) (citing *Washington Loan & Tr. Co. v. Darling*, 21 App. D.C. 132, 140 (D.C. 1903)), exceptional circumstances may justify application of the doctrine of laches "so as practically to reduce the period of limitations in the particular case." *Sis v. Boarman*, 11 App. D.C. 116, 124 (D.C. Cir. 1897).  *Naccache v. Taylor*, 72 A.3d 149 (D.C. 2013), cited by U.S. Bank, is not to the contrary, as the rule it announced applies to actions at law rather than equitable actions such as foreclosure.  *See id.* at 155 (seeing "little to gain and much to lose by applying the equitable defense of laches

---

[15] To succeed on a defense of laches, a party must show "an undue and unexplained delay on the part of one party which works an injustice on the other party." *Amidon v. Amidon*, 280 A.2d 82, 84 (D.C. 1971) (collecting cases).

to cut off claims at law[,]" and observing that "[w]e have never upheld the defense of laches to cut off actions at law for money damages").[16]

### 8. The Quiet Title Counterclaim

Finally, we consider Ms. Archie's counterclaim asking the court to quiet title. The Superior Court found that Ms. Archie could not establish title superior to that of PennyMac and thus had no basis for quieting title.[17] We conclude that whether appellant is entitled to a ruling quieting title depends on the outcome at trial on her other claims. *Cf. Hughes*, 867 F. Supp. 2d at 90 ("[I]t would be premature to dismiss Hughes's quiet title count while his CPPA unconscionability claim remains pending.") (citing *Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Fam. Found., Inc.*, 595 F. Supp. 2d 110, 119 (D.D.C. 2009)). Given our

---

[16] In its summary judgment papers, PennyMac argued that Ms. Archie benefitted from the delay in filing of the foreclosure action because the delay allowed her to live rent-free in the Property for ten years. That may affect the overall equities, but it does not undermine Ms. Archie's claim that the delay in filing of the foreclosure action hindered her ability to prove her defenses.

[17] *See Jessup v. Progressive Funding*, 35 F. Supp. 3d 25, 36 (D.D.C. 2014) (explaining that in order to prevail on a quiet title claim, a claimant must establish title to the property that is superior to any claim by the adverse party).

determination to remand for further proceedings on her affirmative defenses,[18] we vacate the ruling denying her request to quiet title.

## IV.   Conclusion

For the foregoing reasons, the judgment of the Superior Court granting summary judgment in favor of PennyMac/U.S. Bank is vacated, and the matter is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[18] "[W]e by no means foreclose the possibility that these [the various defenses] may be resolved short of trial." *Logan*, 80 A.3d at 1027.